Henry W. MAIER, Petitioner,

v.

The FEDERAL COMMUNICATIONS COMMISSION and the United States of America, Respondents,

WTMJ, Inc., Intervenor-Respondent.

No. 83-1737.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 10, 1983.

Decided May 8, 1984.

Rehearing and Rehearing En Banc Denied June 7, 1984.

Thomas E. Hayes, Deputy City Atty. of Milwaukee, Milwaukee, Wis., for petitioner.

Sue Ann Preskill, F.C.C., Washington, D.C., for respondents.

Before ESCHBACH, POSNER and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

Petitioner Henry W. Maier, the mayor of Milwaukee, Wisconsin, petitions this court for review of an order of the Federal Communications Commission. In that order, the Commission refused to take action against the intervenor in this case, WTMJ, Inc., for what the petitioner claims were violations of the fairness doctrine and the personal attack rule. For the reasons stated below, we affirm the Commission's decision to reject the petitioner's complaint.

## I.

The intervenor, WTMJ, Inc. (WTMJ), is a wholly-owned subsidiary of Milwaukee Journal, Inc., and is licensed to operate an AM radio station, WTMJ; an FM radio station, WKTI; and a television station, WTMJ–TV. Between March 2, 1981, and May 6, 1981, WTMJ broadcast over its three facilities a series of fifteen editorials relating to two controversial issues of public importance: the manner in which the city of Milwaukee was managing its garbage collection system, and the manner in which the city of Milwaukee was handling its labor disputes involving fire, police and garbage collection employees. The editorials were critical of city management and city officials, and a number of the editorials specifically mentioned the petitioner.

On June 5, 1981, the petitioner filed a complaint with the Commission. After being informed by the Commission's staff of certain deficiencies in his complaint, the petitioner submitted an amended complaint, on September 16, 1981. In this complaint, he alleged that WTMJ "in setting forth [its] views on controversial issues of public importance in the editorials referred to above [has] presented only one side of the issue in [its] overall programming," in violation of the fairness doctrine. Pet.App. at 148. The petitioner also contended that WTMJ had violated the Commission's personal attack rule, 47 C.F.R. § 73.1920

(1982), by broadcasting an attack on the petitioner's personal qualities and then failing to provide him with an opportunity to respond. Pet.App. at 129–30. As a remedy for these alleged violations, the petitioner asked that WTMJ be reprimanded, that the petitioner be provided with at least one-half hour free air time of his own choosing on each of WTMJ's broadcast outlets, and that WTMJ be required at its own expense to broadcast viewpoints opposed to its editorial position on the two issues addressed in the petitioner's complaint.

Upon review of the petitioner's complaint, the Commission's Broadcast Bureau requested WTMJ to respond to the petitioner's allegations. WTMJ filed its response on December 16, 1981, admitting that its editorials addressed controversial issues of public importance and thus triggered obligations under the fairness doctrine, but denying that those obligations had been breached. The petitioner filed a reply on February 1, 1982. By letter dated July 29, 1982, the Broadcast Bureau denied the petitioner's amended complaint.

On September 1, 1982, the petitioner filed an application for review before the Commission. Opposition to the application was filed by WTMJ two weeks later. By a memorandum opinion and order dated February 25, 1983, the Commission denied the application for review, finding that WTMJ had not violated either the fairness doctrine or the personal attack rule. The petitioner appeals from this decision.

## II.

As a threshold matter, we must decide whether the Commission's order denying the petitioner's complaint is reviewable, and, if so, whether the petitioner has standing to appeal the order.

A person or organization who believes that a broadcaster is not meeting its fairness doctrine obligations first must complain to the broadcaster. *See Demo-*

*cratic National Committee v. FCC,* 717 F.2d 1471, 1475 (D.C.Cir.1983). If the broadcaster's response is not satisfactory, that person or organization then may file a complaint with the Commission. *Id.* The complaint must present prima facie evidence of a fairness doctrine violation before the Commission will request a response to the complaint from the broadcaster. *Id.* The requirement of making out a prima facie case is "a formidable procedural barrier," *id.,* that only a small percentage of complainants manage to surmount. *Id.* at 1478–79 n. 5. Where this barrier is surmounted, as it was in this case, the Commissioner will conduct an inquiry and issue a ruling. When the Commission finds a fairness doctrine violation, the broadcaster may appeal this ruling, *see, e.g., NBC v. FCC,* 516 F.2d 1101 (D.C.Cir. 1974).[1] Whether a complainant may appeal when the Commission finds no fairness doctrine violation is the question we address here.

We note that this question has not been briefed or discussed by any of the parties or the amici, presumably because they did not believe it to be in dispute. This is understandable, since several courts of appeals have permitted appeals such as the one before us without even mentioning the issues of reviewability and standing. *See, e.g., Democratic National Committee v. FCC,* 717 F.2d 1471 (D.C.Cir.1983); *American Security Council Education Foundation v. FCC,* 607 F.2d 438 (D.C.Cir.), *cert. denied,* 444 U.S. 1013, 100 S.Ct. 662, 62 L.Ed.2d 642 (1979); *Neckritz v. FCC,* 446 F.2d 501 (9th Cir.1971). *See also Council For Employment and Economic Energy Use v. FCC,* 575 F.2d 311 (1st Cir.1978) (holding, without analysis, that the petitioner had standing to appeal the denial of its fairness doctrine complaint). For the reasons stated below, we agree with the implicit holding of these opinions, that a party whose fairness doctrine complaint is denied

---

**1.** Although Judge Posner suggests that a broadcaster would have standing because it would suffer direct economic injury, the Supreme Court has stressed that standing may stem from noneconomic injury as well. *See Association of Data Processing Service Organizations v. Camp,* 397 U.S. 150, 154, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1969).

by the Commission may seek judicial review of that denial.[2]

### A. Reviewability

As enacted by Congress, the Communications Act of 1934, ch. 652, 48 Stat. 1064 (codified as amended at 47 U.S.C.) provided a comprehensive scheme of federal regulation of wire and radio communication. *See generally Xavier University v. National Telecommunications*, 658 F.2d 306 (5th Cir.1981). The Act established the Commission at the center of this scheme and charged it with "execut[ing] and enforc[ing] the provisions of the Act." 47 U.S.C. § 151 (1976). Because the Commission was given both enforcement and decision-making responsibilities, *see* S.Rep. No. 781, 73d Cong., 2d Sess. 8–10 (1934), Congress also provided for judicial enforcement and review of its orders. As amended, the Act provides for review of Commission rulings in the United States courts of appeals:

> Any proceeding to enjoin, set aside, annul or suspend any order of the Commission under this chapter ... shall be brought as provided by and in the manner prescribed in chapter 158 of Title 28.

47 U.S.C. § 402(a) (1976). Chapter 158 of Title 28 contains the following:

> The court of appeals has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of—
>
> (1) all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47; ...

28 U.S.C. § 2342 (1976). The Communications Act also provides for judicial review of certain Commission decisions exclusively in the United States Court of Appeals for the District of Columbia Circuit. 47 U.S.C. § 402(b) (1976).

█ The petitioner in this case has sought review, we believe properly, under sections 402(a) and 2342. Judge Posner argues in his separate opinion, however, that when the Commission rules that the fairness doctrine has not been violated it is exercising prosecutorial discretion, and that therefore its ruling is not reviewable. This position relies on section 10 of the Administrative Procedure Act (APA), which states that judicial review of agency action is available except "to the extent that ... agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2) (1982).[3] However, Judge Posner's approach fails to appreciate that this exception to the reviewability of agency action is a "very narrow exception," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971), and that there is always a "strong presumption" that agency action is reviewable. *Dunlop v. Bachowski*, 421 U.S. 560, 567, 95 S.Ct. 1851, 1857, 44 L.Ed.2d 377 (1975). Indeed, it is well-settled law that "judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967). "[O]nly upon a showing of 'clear and convincing

---

**2.** Although our discussion of reviewability and standing mentions only the fairness doctrine, it also applies to the personal attack rule, which is considered to be a component of the fairness doctrine. *See Straus Communications, Inc. v. FCC*, 530 F.2d 1001, 1003 (D.C.Cir.1976).

**3.** Actually, § 10 of the APA merely says that where agency action is committed to agency discretion by law, the provisions of the APA providing for judicial review of agency decisions are inapplicable. Since the petitioner in this case is not relying on the APA for judicial review, but rather on a provision of the Communications Act, there is some question as to whether § 10 can be used to limit judicial re-

view in this case. If not, there is at least an argument that there are common law limits on the reviewability of Commission decisions, since some courts have interpreted the APA to be merely a codification of the common law of reviewability as it existed at the time of the APA's enactment in 1948. *See Peoples Gas, Light and Coke Co. v. United States Postal Service*, 658 F.2d 1182, 1191 (7th Cir.1981) and authority cited therein. We need not decide either question, however, because in any event we are convinced that the Commission's ruling in this case was not action so committed to agency discretion that it is not reviewable.

evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Id.* at 141, 87 S.Ct. at 1511 (citations omitted). *See also Morris v. Gressette,* 432 U.S. 491, 500–01, 97 S.Ct. 2411, 2418–2419, 53 L.Ed.2d 506 (1977); *Barlow v. Collins,* 397 U.S. 159, 165–67, 90 S.Ct. 832, 837–838, 25 L.Ed.2d 192 (1970); *Peoples Gas, Light and Coke Co. v. United States Postal Service,* 658 F.2d 1182, 1190 (7th Cir.1981). Judge Posner has not offered, nor can we find, any "clear and convincing evidence," or evidence *of any kind,* of congressional intent to exempt actions of the Commission such as the one in this case from judicial review.

Although our inquiry could end here, it is worth stressing that we have several positive reasons for finding that the Commission's order is reviewable. The most obvious reason is the Communications Act itself. Unlike other statutes under which the Supreme Court has found a right to judicial review, *see, e.g., Dunlop v. Bachowski,* 421 U.S. at 566–71, 95 S.Ct. at 1857–1859 (nothing in the Labor-Management Reporting and Disclosure Act prohibits judicial review of the Secretary of Labor's decision not to sue), the Communications Act actually contains a section, section 402, that explicitly provides for judicial review. This fact is significant because it reinforces the already strong presumption of reviewability applicable to this case. Although section 402 does not refer specifically to the type of Commission decision at issue here, disappointed fairness doctrine complainants seeking judicial review repeatedly have relied on section 402 without

question. Congress has amended the Communications Act several times, but it has done nothing to limit judicial review of the Commission's rulings on fairness doctrine complaints, a fact we find significant. *See Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 380–82, 89 S.Ct. 1794, 1801–1802, 23 L.Ed.2d 371 (1969).[4]

We also find it noteworthy that the Commission itself has not advanced the position that its denial of a fairness doctrine complaint is not reviewable. From this fact it is reasonable to infer that the Commission construes section 402 as providing a basis for judicial review in cases such as this one. It is a "venerable principle" of law that "the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong ...." *Red Lion Broadcasting Co. v. FCC,* 395 U.S. at 381, 89 S.Ct. at 1802. This is especially true where, as here, "Congress has refused to alter the administrative construction." *Id. See also CBS v. FCC,* 453 U.S. 367, 382, 101 S.Ct. 2813, 2823, 69 L.Ed.2d 706 (1981).

Further support for our holding that the Commission's order is reviewable can be found in the wealth of cases that stress the importance of appellate review of Commission rulings. For example, in *FCC v. RCA Communications,* 346 U.S. 86, 91, 73 S.Ct. 998, 1002, 97 L.Ed. 1470 (1953), the Supreme Court stated, "Congress has charged the courts with the responsibility of saying whether the Commission has fairly exercised its discretion within the vaguish, penumbral bounds expressed by the standard of 'public interest.' "[5] Similarly,

*Red Lion Broadcasting Co. v. FCC,* 395 U.S. at 380–82, 89 S.Ct. at 1801–1802.

**4.** In 1959 Congress amended § 315 of the Communications Act, which requires broadcasters to give equal time to political candidates, to except certain appearances on news programs. In doing so, it added that this new exception constituted no exception "from the obligation imposed upon them under this Act to operate in the public interest and to afford reasonable opportunity for the discussion of conflicting views on issues of public importance." 47 U.S.C. § 315(a) (1976). Thus, not only has Congress done nothing to limit judicial review of fairness doctrine enforcement, it actually "has ratified [the fairness doctrine] with positive legislation."

**5.** Before the fairness doctrine was explicitly included in the Communications Act, it was embodied in decisions of the Commission made pursuant to the Commission's statutory duty to assure that broadcasters operate in the "public interest". *See Red Lion Broadcasting Co. v. FCC,* 395 U.S. at 375–86, 89 S.Ct. at 1798–1804. If this vague "public interest" standard were still the only statutory basis for the fairness doctrine, there might be a stronger argument for nonreviewability of the Commission's order in

courts in many cases have reaffirmed the importance of meaningful review of Commission rulings by insisting that the Commission articulate the reasons for its decisions. *See, e.g., Melody Music, Inc. v. FCC,* 345 F.2d 730, 733 (D.C.Cir.1965). *See generally Public Media Center v. FCC,* 587 F.2d 1322, 1331 (D.C.Cir.1978). This requirement, known as the *Melody Music* doctrine, has been said to "flow[ ] naturally from the functional relationship existing between reviewing court and administrative agency." *Public Media Center v. FCC,* 587 F.2d at 1331.

Although many of the cases that stress the importance of judicial supervision of the Commission have arisen in the context of licensing proceedings, judicial review is no less important here. A reviewing court's job is to see that the Commission's regulation of broadcasters is in "the public interest." *FCC v. RCA Communications,* 346 U.S. at 91, 73 S.Ct. at 1002. A broadcaster's compliance with the fairness doctrine is at the core of this "public interest" standard. As the District of Columbia Circuit has stated, "strict adherence to the fairness doctrine [is] the single most important requirement of operation in the public interest—the 'sine qua non' for grant of a renewal of license." *Public Media Center v. FCC,* 587 F.2d at 1328 n. 32 (citations omitted). The fact that the Commission has chosen to rule on fairness doctrine complaints as they are filed rather than waiting for license renewal proceedings, *see generally NBC v. FCC,* 516 F.2d 1101, 1115–17 (D.C.Cir.1974), *cert. denied,* 424 U.S. 910, 96 S.Ct. 1105, 47 L.Ed.2d 313

(1975), should not make those rulings non-reviewable. Nor should it matter that in a particular case the Commission has found no violation of the fairness doctrine. It is difficult to understand how the courts can supervise meaningfully the Commission's enforcement of the fairness doctrine if they may review only those cases where the Commission finds a fairness doctrine violation.

Finally, the mere fact that in this case the Commission was refusing to take action against the licensee, as opposed to affirmatively taking such action, does not make the Commission's ruling an exercise of discretion not reviewable by this court.[6] In *Rochester Telephone Corp. v. United States,* 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147 (1939), the Supreme Court considered the situation where a complainant appeals a ruling by the Commission refusing to forbid or compel conduct by a third party, the precise situation before us. It found the distinction between "action" and "non-action"—the distinction drawn by Judge Posner—to be unsatisfactory for purposes of deciding which decisions of the Commission are reviewable under section 402(a). The Court stated: "An order of the Commission dismissing a complaint on the merits and maintaining the status quo is an exercise of administrative function, no more and no less, than an order directing some change in status." *Id.* at 142, 59 S.Ct. at 763. The Court added that while the "affirmative" or "negative" nature of the Commission's order may "bear[ ] on the disposition of a case, [it] *should not control jurisdiction.*" *Id.* (emphasis added).[7]

---

this case. This is because agency action is considered "committed to agency discretion by law" where "statutes are drawn in such broad terms that in a given case there is no law to apply." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971). However, Congress's ratification of the fairness doctrine clearly does give courts a meaningful statutory basis for reviewing rulings of the Commission on fairness doctrine complaints, and, in fact, a body of law has been developed on this subject. Moreover, it would be anomalous to hold that there is "no law to apply" when the Commission fails to find a fairness doctrine violation, but that there is law

to apply where the Commission does find a violation.

6. Similarly, it is not the label given to an order of the Commission, but rather the substance of the order, that determines whether the order is reviewable. *CBS v. United States,* 316 U.S. 407, 416, 62 S.Ct. 1194, 1199, 86 L.Ed. 1563 (1942).

7. In other contexts, the reviewability of an agency's decision not to impose or pursue imposition of a sanction has depended on the particular statutory scheme involved. Some courts have found such decisions to be reviewable, *see, e.g., Dunlop v. Bachowski,* 421 U.S. 560, 95 S.Ct.

To sum up the reviewability question, there is a strong presumption that the Commission's order in this case is reviewable, and we can find no basis for overcoming this presumption. In the face of this presumption, as well as a statute that explicitly provides for judicial review of Commission orders and the precedent of numerous cases that implicitly hold or otherwise indicate that the Commission's denial of a fairness doctrine complaint is reviewable, Judge Posner offers his view that "the FCC is a prosecutor." *Post* at 238.[8] From this he concludes that the Commission's order in this case is not reviewable. We must disagree.

### B. Standing

■ Although it is true that standing and reviewability are conceptually distinct issues, *see generally Peoples Gas, Light and Coke Co. v. United States Postal Service*, 658 F.2d 1182, 1188 n. 3 (7th Cir.1981), in this case at least they are interrelated as a practical matter. If, as we have found, Congress meant for the Commission's enforcement of the fairness doctrine to be subject to judicial review, it follows that someone must have standing to bring an appeal in a particular case where the Commission refuses to find a fairness doctrine violation.[9] Thus, the reasons that we have already advanced to support our holding that the Commission's order in this case is reviewable also support the principle that complainants have standing to appeal the denial of their fairness doctrine complaints. However, because we recognize that the

doctrine of standing can act as an affirmative barrier to judicial review in a particular case, we will discuss the standing question separately.

Judge Posner may be correct in suggesting that under conventional principles of standing the petitioner would not have standing to bring this appeal. However, it seems well established that conventional principles of standing are inappropriate in the unique context of broadcast regulation. In *Scripps-Howard Radio v. FCC*, 316 U.S. 4, 62 S.Ct. 875, 86 L.Ed. 1229 (1942), the Supreme Court discussed the matter of standing to seek judicial review under the Communications Act. After first noting that the Communications Act was enacted to "protect the public interest," the court stated: "By section 402(b)(2) Congress gave the right of appeal to persons 'aggrieved or whose interests are adversely affected' by Commission action. But these private litigants have standing only as representatives of the public interest." *Id.* at 14, 62 S.Ct. at 882 (citations omitted).[10] The Court went on to compare orders reviewable under section 402(a), under which review is sought in this case, with orders reviewable under section 402(b). The Court examined the legislative history of the Communications Act and concluded that the difference between the two sections

had no relation to the scope of the judicial function which the courts were called upon to perform.... As the legislative history of the Act plainly shows, Congress provided the two roads to judicial

---

1851, 44 L.Ed.2d 377 (1975), and others have not. *See, e.g., Southern Railway Co. v. Seaboard Allied Milling Corp.*, 442 U.S. 444, 99 S.Ct. 2388, 60 L.Ed.2d 1017 (1979).

**8.** We note that in some of the cases in which a disappointed complainant was allowed to appeal the denial of its fairness doctrine complaint, the Commission had dismissed the complaint for failure to make out a prima facie case. *See, e.g., Democratic National Committee v. FCC*, 717 F.2d 1471 (D.C.Cir.1983); *American Security Council Education Foundation v. FCC*, 607 F.2d 438 (D.C.Cir.1979) (en banc). Arguably, this type of dismissal is more like the exercise of prosecutorial discretion than the dis-

missal in the case before us, yet the Commission's decision still was found to be reviewable.

**9.** It has been suggested that when a statute specifically provides for judicial review, the test for standing should be liberally construed. *Washington Utilities and Transportation Commission v. FCC*, 513 F.2d 1142, 1149 n. 8 (9th Cir.1975).

**10.** Since the *Scripps-Howard* case was decided, § 402(b) has been amended. What was once § 402(b)(2) is now § 402(b)(6). The modification of § 402(b) was for purposes of clarity; the current and former versions of § 402(b) are "substantially the same." *Cook, Inc. v. United States*, 394 F.2d 84, 87 (7th Cir.1968).

review only to save a licensee the inconvenience of litigating an appeal in Washington in situations where the Commissioner's order arose out of a proceeding not instituted by the licensee.

*Id.* at 15–16, 62 S.Ct. at 882–883. It is true, as Judge Posner states, that the Court in *Scripps-Howard* was faced with a question different from that presented to us. However, this does not change the fact the Court examined the legislative history of the two sections and found that the difference between them "was in large measure the product of Congressional solicitude for the convenience of litigants." *Id.* at 15, 62 S.Ct. at 882. Thus, we have no reason to believe that the difference between the two sections relates to the issue of standing.[11] Judge Posner's assertion that cases that discuss standing under section 402(b) are inapplicable to the instant case cannot be accepted.

As the *Scripps-Howard* case makes clear, the concept of standing in the context of broadcast regulation is different from that applied in other contexts, because it is the interests of an amorphous, disorganized group called "the listening public" that are at stake. In order to ensure that the rights of the listening public are adequately protected, courts have construed the concept of standing very broadly. A seminal case in this area is *Office of Communication of the United Church of Christ v. FCC*, 359 F.2d 994 (D.C.Cir.1966), in which the court held that responsible members of the listening public are "aggrieved" under the Communications Act and thus have standing to challenge the renewal of a broadcaster's license. The court rejected the notion that a party needed a direct, particularized injury in order to participate in the Commission's proceedings. Rather, the court stressed that public participation in broadcast regulation

was necessary to fulfill the objectives of the Communications Act, since it was not feasible for the Commission to monitor the airwaves by itself, and thus the Commission alone could not protect effectively the interests of the listening public. *Id.* at 1004–05. Significantly, the court indicated that a party's standing to appeal an order of the Commission should be governed by the same standards as a party's standing before the Commission, *id.* at 1000 n. 8, and it held that the petitioner had standing to appeal the case before it.

The principle that private parties are needed to vindicate the public interest in Commission proceedings and on appeal from those proceedings was reaffirmed in *Illinois Citizens Committee for Broadcasting v. FCC*, 515 F.2d 397 (D.C.Cir. 1975). In that case, a private organization was found to have standing as a representative of the listening public to challenge the substantive grounds for a ruling by the Commission that certain broadcasts were obscene, even where the licensee who was sanctioned had acquiesced in the Commission's decision. The court found that the petitioner's standing was "implicit in the contours of the statute, a procedural right that furthers the substantive rights of the public under the First Amendment." *Id.* at 406. Writing separately in that case,[12] Chief Judge Bazelon discussed the importance of permitting members of the public to have standing during and on appeal from Commission proceedings. *Id.* at 410–14. At one point, he stressed the fact that listener standing is not unusual:

The legality of listener standing is so well accepted that the point is never raised in the present FCC litigation. A survey of recent cases in this circuit demonstrates, however, that *listeners have been implicitly granted standing to challenge just about every form of FCC*

---

11. This conclusion is buttressed by the fact that 28 U.S.C. § 2344 (1976), which is to be read in conjunction with § 402(a), does state that "[a]ny party aggrieved" by a Commission order may appeal that order. In addition, § 702 of the APA, 5 U.S.C. § 702 (1982), provides a basis for standing for any party "adversely affected or

aggrieved by agency action within the meaning of a relevant statute ...."

12. Chief Judge Bazelon was not part of the panel that decided the case, but was writing to explain why he voted to grant rehearing en banc.

*program regulation or of licensee programming activity.*

*Id.* at 411 n. 17 (citations omitted) (emphasis added).

There is no reason that the broad concept of standing that has been invoked in virtually every other situation involving broadcast programming regulation should not be applicable here. As we have already indicated, the fairness doctrine has been held to be at the core of the "public interest" standard in broadcast communication, and thus it is a central feature of our existing scheme of broadcast regulation. *See supra* at 226. The fairness doctrine, however, cannot serve the public interest without the public's help. As the Commission itself has recognized, citizen complaints provide the principal means of insuring that broadcasters comply with the fairness doctrine. *Fairness Report*, 48 F.C.C.2d 1, 18 (1974). Just as the Commission must rely on private persons or groups to represent the public interest in its regulation of broadcasters under the fairness doctrine, reviewing courts must rely on these same private parties in our supervision of the Commission's regulation. The other courts of appeals that have permitted parties to appeal the denial of their fairness doctrine complaints have implicitly recognized this, as has the Commission itself, and we see no reason to take a different position.[13]

Judge Posner, however, would distinguish this case from others on the ground that the petitioner here is not truly a representative of the public interest. In fact, his entire view of this case, with respect to both standing and reviewability, appears to rest on this ground. Judge Posner has decided that the petitioner brought his fairness doctrine complaint and this appeal either because he is a politician seeking to protect his ability to do his job or his prospects for reelection, or because he is someone who thinks that the broadcaster is misleading the public with regard to issues of public policy in which he has a stake (two of the three types of persons who, according to Judge Posner, might bring a fairness doctrine complaint). *Post* at 236. For this reason, he argues, the petitioner should not be permitted to bring this appeal. This assertion is unacceptable. First, Judge Posner has chosen to create three categories of fairness doctrine complainants; there is no prior authority for such distinctions in the history of broadcast regulation. Next, it is summarily decided that the petitioner is not a member of WTMJ's listening audience and that he "does not sue as a representative of listeners." *Post* at 236. Rather, the petitioner fits into the two categories of complainants to which, according to this theory, the injury suffered is not sufficiently concrete to confer standing. In arriving at this conclusion, Judge Posner attempts to distinguish the cases that hold that private parties may seek judicial review of Commission action as representatives of the listening public, but he discards one of the central teachings of those cases: a direct, concrete, particularized injury is unnecessary for a party to have standing as a representative of the public interest. Thus, set forth is a criterion for standing that is inappropriate in this context. Furthermore, in reaching his conclusion, Judge Posner ascribes to the petitioner certain motives for bringing this suit, the existence of which has never been adjudicated. Those motives then are deemed relevant to

---

**13.** Although we do not deem it necessary in this unique context to justify our result in terms of conventional standing principles, it is possible to do so. The conventional test for standing is "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Service Organization v. Camp*, 397 U.S. at 153, 90 S.Ct. at 830. This "zone of interests" test is a "generous standard." *Alschuler v. HUD*, 686 F.2d 472, 481 (7th Cir.1982); *Peoples Gas, Light and Coke Co. v. United States Postal Service*, 658 F.2d at 1195. "Thus, in the terms of the conventional standing analysis, listeners have interests which are within the 'zone of interests' of the relevant statute and they, therefore, have standing if they allege an injury in fact to those interests." *Illinois Citizens Committee for Broadcasting v. FCC*, 515 F.2d 397, 412 (D.C.Cir.1975) (opinion of Chief Judge Bazelon).

the question of standing when in fact they have never been so considered.

This position not only is completely unprecedented but also would undermine seriously the functional relationship between the Commission and the courts of appeals. It appears that Judge Posner would not allow a party standing to appeal the denial of its fairness doctrine complaint where the party was bringing its appeal to further its own personal interests.[14] The consequence of such a ruling would probably be that denials of fairness doctrine complaints would seldom, if ever, be appealed, since, as the Supreme Court has recognized in this context, *see FCC v. Sanders Brothers Radio Station*, 309 U.S. 470, 477, 60 S.Ct. 693, 698, 84 L.Ed. 869 (1940), only those parties with a substantial personal stake in the Commission's action are likely to go to the trouble and expense of contesting the Commission's decision.[15]

The net effect of Judge Posner's approach in this case, whether it be through his analysis of standing or of reviewability, would be the almost complete insulation from appellate review of Commission enforcement of the fairness doctrine. As it is, there are significant limits on the ability of courts to monitor enforcement of the fairness doctrine meaningfully, including a deferential standard of review. *See infra* at 231. While there may be good reasons for this, we think it goes too far to practically strip the federal courts of their supervisory powers in this area by permitting them to review only those cases where the Commission actually finds a fairness doctrine violation. Such a result is particularly unacceptable when there is no evidence

of legislative intent and no precedent that might support it.

## III.

Turning to the merits of the case, we look first to the petitioner's allegation that WTMJ has violated the fairness doctrine. The policies behind this doctrine, as well as the principles that comprise it, have been explored at length by the Supreme Court, *see Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), the District of Columbia Circuit, *see American Security Council Education Foundation v. FCC*, 607 F.2d 438 (D.C.Cir. 1979) (en banc), and the Commission itself, *see Fairness Report*, 48 F.C.C.2d 1 (1974), and we need only recount them briefly here.

The purpose of the fairness doctrine is to promote the "paramount right of the public in a free society to be informed and to have presented to it for acceptance or rejection the different attitudes and viewpoints concerning [the] vital and often controversial issues which are held by various groups which make up the community." *Report on Editorializing by Broadcast Licensees*, 13 FCC 1246, 1249 (1949). In keeping with this purpose, a licensed broadcaster has two basic obligations under the fairness doctrine: to devote a reasonable percentage of broadcast time to the coverage of controversial issues of public importance and to provide a reasonable opportunity for presentation of conflicting views regarding such issues. *See Red Lion Broadcasting Co. v. FCC*, 395 U.S. at 377, 89 S.Ct. at 1799. The petitioner alleg-

---

**14.** In this sense, the parties who would not have standing under Judge Posner's approach actually have a more particularized, concrete injury than those who would have standing. This is somewhat ironic, since under conventional standing principles a particularized interest or injury is an essential prerequisite to standing. It is also somewhat curious to suggest that the petitioner does not represent the public interest, when in fact the petitioner is the highest-ranking elected official in the city of Milwaukee, in which much of WTMJ's listening audience resides.

**15.** Because of the time and expense required to complain to the Commission, make out a prima facie case, and then appeal an adverse ruling, there is no reason to think that a stringent standing requirement is necessary to curb a flood of appellate litigation in this area. Indeed, Judge Posner acknowledges that appeals such as the one before us are "unusual." *Post* at 236.

es that WTMJ has breached this latter obligation.

 A broadcaster is allowed significant journalistic discretion in deciding how it will fulfill its obligations under the fairness doctrine. *CBS v. Democratic National Committee*, 412 U.S. 94, 111, 93 S.Ct. 2080, 2090, 36 L.Ed.2d 772 (1973). When the question is whether a broadcaster has made a reasonable effort to provide balanced coverage of controversial issues of public importance, as it is here, the test is not one of equal time or identity of treatment, but rather is one of good faith and reasonableness. *Democratic National Committee v. FCC*, 717 F.2d 1471, 1477 (D.C.Cir.1983) (per curiam). The Commission has stated:

> When a licensee presents one side of a controversial issue he is not required to provide a forum for opposing views on the same program or series of programs. He is simply expected to make a provision for the opposing views in his overall programming. Neither is he required to present an "equal balance" of views on a particular public issue. Our steadfast commitment to a system of electronic communication in which an individual broadcaster is free to exercise wide journalistic discretion is illustrated by the fact that under this doctrine the broadcast licensee is called upon and is responsible for the determination in each instance of the most appropriate means of informing his listeners. Unless clearly unreasonable, editorial decisions of this nature will not be disturbed.

*Energy Action Committee*, 64 F.C.C.2d 787, 796–97 (1977). Just as the Commission must give some deference to the broadcaster in reviewing a fairness doctrine complaint, a court must give some deference to the Commission in its review of a decision made by the Commission on a fairness doctrine complaint. *CBS v. Democratic National Committee*, 412 U.S. at 102, 93 S.Ct. at 2086. Accordingly, our task on this appeal is to determine " 'whether the Commission's order is unreasonable or in contravention of statutory

purpose.' " *American Security Council Education Foundation v. FCC*, 607 F.2d at 438 (quoting *Neckritz v. FCC*, 446 F.2d 501, 502–03 (9th Cir.1971) (per curiam)).

The Commission found that WTMJ had complied with the fairness doctrine because it had "diligently sought to present contrasting views" to its series of editorials on the city of Milwaukee's labor disputes and garbage collection. Pet.Br.App. at 5. The focus of the Commission's discussion was on efforts made by WTMJ to afford the petitioner an opportunity to broadcast a response to the editorials. The Commission first noted three routine practices employed by WTMJ to solicit a range of responses to its editorials. These practices were:

(1) Closing each editorial with the following statement:

This comment is a statement of opinion on the part of the management of Channel Four, WTMJ Radio and WKTI for the purpose of stimulating thought and consideration of matters which are of concern to the public. Any expression on your part will be welcome. Write to: WTMJ, Inc., P.O. Box 693, Milwaukee, Wisconsin 53201;

(2) maintaining an extensive mailing list of people who are interested in a particular issue, to whom both a copy of and an invitation to respond to the editorial are sent;

(3) maintaining a permanent mailing list of people to whom a copy of and an invitation to respond to all the editorials are sent.

The Commission found that the petitioner was on both the permanent mailing list and the mailing list for the editorials on the city's garbage collection and labor disputes. The Commission also found that there had been *"direct communication"* between WTMJ and the petitioner's office on the subject of responses to the editorials. Pet. Br.App. at 5 (emphasis in original). Two specific instances of such communication were noted. First, a WTMJ employee had held a conversation with a member of the petitioner's staff named Art Strickland,

during which Strickland had indicated that the petitioner's office was aware of the petitioner's opportunity to reply. Second, a WTMJ news reporter had asked the petitioner if he intended to respond to the editorials. The petitioner replied, "When I respond, it will be on my own terms." [16] Hence, the Commission concluded that the petitioner "was in fact aware of the licensee's willingness to afford him an opportunity to reply to the editorials and that [he] conveyed this awareness to the licensee." Pet.Br.App. at 5.

The petitioner challenges the Commission's conclusion, contending that neither he nor his staff members were actually extended a "specific invitation," either orally or in writing, to respond to the editorials, and that the record contains insufficient evidence that he was aware of an opportunity to respond. However, our review of the record leads us to conclude that, if in fact the petitioner never was formally invited to respond to the editorials, it was only because WTMJ was led to believe by the petitioner and his staff that the petitioner was already aware that he could respond if he so wished. *See, e.g., supra* note 16. While WTMJ could have

been more direct in its efforts to present the petitioner with an opportunity to respond, it does not appear that WTMJ's failure to formally offer the petitioner response time left the petitioner unaware of his opportunity to respond. Thus, we agree with the Commission's finding that WTMJ made the petitioner aware of a continuing opportunity to broadcast a response to its editorials, and that the petitioner simply declined to take advantage of this opportunity.[17]

Because the petitioner obviously was the key spokesperson for opposing viewpoints, we also agree with the Commission that making the petitioner aware of a chance to respond to the editorials was a significant step for WTMJ toward the fulfillment of its obligations under the fairness doctrine. However, we do not agree with the Commission's suggestion, made in the conclusion of its memorandum opinion and order, that the fairness doctrine "require[s] nothing more from broadcast licensees." Pet.Br.App. at 6. The fairness doctrine does require more. A broadcaster has an affirmative obligation under the fairness doctrine to seek to provide a rea-

---

**16.** The reporter, Tom Luljak, recalled the incident as follows:

> On March 25, I met with Mayor Maier in the hallway outside his office. During a wide-ranging conversation, I asked him if he had seen our station's editorial the night before. The mayor said he had not, but that he had heard about it. I asked the mayor if he was interested in responding to the editorial and he replied, "I'm not interested in that ... 40 or 45 second[s] ... that you give me. When I respond, it will be on my own terms." When I asked the mayor what he meant, he said, "I'm thinking of something like a half-hour or hour." I told the mayor we have limits, but that he ought to call Ed Hinshaw and talk to him about his request.

> Pet.App. at 209.

**17.** The petitioner contends that on April 14, 1981, he submitted a proposed Federal Communications Commission complaint to WTMJ in which he requested one-half hour of free air time to respond to WTMJ's editorials. Pet.Br. at 2. He states that WTMJ did not reply formally, but that its station manager was quoted on the air as saying that WTMJ would respond to the petitioner's charges if and when required by the

Commission. *Id.* Because the petitioner failed to include a copy of this request in the record, and since it was in the form of a complaint to the Commission, we cannot determine whether it can be construed fairly as a request of WTMJ for response time. The Broadcast Bureau apparently thought not, since in its letter to the petitioner denying his complaint, it stated, "We also note that you have neither responded to the licensee's invitations, nor have you specifically requested and been denied air time by the licensee." Pet.Br.App. at 11. In the absence of a more complete record on this factual question, we must defer to the Broadcast Bureau's finding that the petitioner has not specifically requested and been denied air time by WTMJ. Moreover, even assuming that the proposed complaint could be construed as a request of WTMJ for response time, one-half hour is an unusually large amount of response time. If in fact the petitioner was insisting on responding "on his own terms," as the record suggests, *see supra* note 16, WTMJ would have been justified in denying his request. A licensee has significant discretion in determining how it will fulfill its fairness doctrine obligations. *CBS v. Democratic National Committee,* 412 U.S. 94, 111, 93 S.Ct. 2080, 2090, 36 L.Ed.2d 772 (1973).

sonably balanced presentation of views on controversial issues of public importance. Absent unusual circumstances not present here, a broadcaster may not make such a presentation totally dependent on a particular individual's willingness to request a forum to present his or her views on the issues in question. This is because the fairness doctrine is rooted in " 'the right of the public to be informed, rather than any right on the part of the Government, any broadcast licensee, or any individual member of the public to broadcast his own particular views on any matter....' " *CBS v. Democratic National Committee*, 412 U.S. 94, 112–13, 93 S.Ct. 2080, 2091, 36 L.Ed.2d 772 (1973) (quoting *Report of Editorializing by Broadcast Licensees*, 13 F.C.C. 1246, 1249 (1949)). Thus, we cannot conclude that WTMJ made a reasonable effort to inform the public about the issues addressed in its editorials simply by giving the petitioner invitations to respond to those editorials, at least where, as here, those invitations were declined.

 We nevertheless have sufficient grounds for affirming the Commission's ruling, because the Commission did not rest its decision entirely on the willingness of WTMJ to broadcast the views of the petitioner. The Commission also found that WTMJ took other steps to create opportunities for the presentation of conflicting views regarding the subjects of its editorials. First, there were the three routine practices noted above: the statement made at the close of each editorial, the mailing of editorials and invitations to respond to persons interested in the particular issues, and the maintenance of a permanent mailing list of persons to whom all editorials and invitations to respond are mailed.[18] Second, there were invitations made to other city officials to discuss publicly the issues raised in WTMJ's editorials. Specifically, the city's Commissioner of Public Works was invited three times and the Acting Superintendent of the Sanitation Bureau was invited once to appear on the "Open Question," a WTMJ television and radio talk show. Both officials declined these invitations. Third, WTMJ provided opportunities for public officials, including the petitioner, to express their views on the issues in question here during the normal course of its news coverage. This news coverage included interviews with the petitioner's press conferences in mid-March 1981 were carried live by WTMJ's television station, and excerpted by its radio stations. During these press conferences, the petitioner had an opportunity to and did in fact express his views on the garbage collection and labor dispute issues.

In view of all the facts of this case, we cannot say that WTMJ has acted unreason-

18. These three practices, standing alone, could not sustain a finding that WTMJ had fulfilled its fairness doctrine obligations, at least on the record before us. The message at the close of each editorial broadcast merely invites opposing viewpoints; it does not indicate clearly a willingness on the part of WTMJ to broadcast opposing viewpoints. Although we do not know the precise wording of the invitation extended by mail, because it was not included in the record, it does appear from the record that it too merely invites opposing viewpoints without actually offering response time. Pet.App. at 195 (letter of WTMJ president to the Commission stating that the invitation broadcast at the end of each editorial is also mailed to persons on two different mailing lists). While the record in this case indicates that the petitioner understood that he could have response time if he so requested, it does not give the same indication as to members of the public. *See Mid-Television Corporation*, 40 F.C.C. 620, 621 (1964) ("[t]he fairness doctrine is not so well known that persons receiving copies of station editorials know that they are being offered an opportunity to respond"). Furthermore, even if the invitations did mention air time to respond, a mere statement of willingness to provide response time is an empty gesture unless accompanied by a good faith intent to actually provide response time to members of the public. In this case, while we do not doubt WTMJ's good faith intent to provide response time, we note that there has been a complete failure by WTMJ and the Commission to create a record on this question. We have been provided with no information on how many persons were on the two mailing lists, how many persons, if any, actually requested air time as a result of the broadcasted and mailed invitations, and why any such requests were denied. In view of this failure of proof, as well as the ambiguousness of the invitation to respond, WTMJ's routine practice of inviting responses from the public can count for little toward the fulfillment of its fairness doctrine obligations at issue in this case.

ably or in bad faith in attempting to fulfill its obligations under the fairness doctrine. Because good faith and reasonableness are all that the fairness doctrine requires of a broadcaster, we affirm the Commission's decision to deny the petitioner's complaint under the fairness doctrine.[19]

## IV.

We now turn to the personal attack aspect of the petitioner's complaint. The personal attack rule is codified at 47 C.F.R. § 73.1920 (1982). It reads in pertinent part:

> When, during the presentation of views on a controversial issue of public importance, an attack is made upon the honesty, character, integrity or like personal qualities of an identified person or group, the licensee shall, within a reasonable time and in no event later than one week after the attack, transmit to the persons or group attacked:
>
> (1) Notification of the date, time and identification of the broadcast;
>
> (2) A script or tape (or an accurate summary if a script or tape is not available) of the attack; and
>
> (3) An offer of a reasonable opportunity to respond over the licensee's facilities.

The petitioner has alleged that the editorials broadcast by WTMJ constituted an attack on his personal qualities and that WTMJ violated the personal attack rule by failing to offer him an opportunity to respond over its facilities.

Relying on *L.E. White, Jr.*, 11 F.C.C.2d 687 (1968), the Commission held that there was no need to decide the question of whether WTMJ's editorials constituted a personal attack on the petitioner, because in any event the petitioner had been made aware of an opportunity to respond and the requirements of the personal attack rule thus had been satisfied. Pet.Br.App. at 5–6. The petitioner challenges this ruling. Citing *Straus Communications, Inc. v. FCC*, 530 F.2d 1001 (D.C.Cir.1976), he contends that the Commission must insist on strict compliance with the notice and offer requirements of the personal attack rule, and that by resting its decision on its finding that the petitioner was in fact aware of an opportunity to respond, the Commission failed to insist on strict compliance in this case.

▮ *Straus*, however, held only that "it is *entirely proper* for the commission to insist on strict compliance with the notice and offer requirements" of the personal attack rule. 530 F.2d at 1009 n. 19 (emphasis added). Given that the purpose of the rule's notice and offer requirements is to make the subjects of personal attacks aware of the nature of the attacks and their opportunity to respond, it is not unreasonable for the Commission not to insist on strict compliance with the rule in a particular case where it finds that the subject was aware of the broadcasts and his opportunity to respond. Because WTMJ notified the petitioner of the editorials at issue here and supplied him with transcripts of the editorials, and because the petitioner was made aware of his opportunity to respond to the editorials, we affirm the Commission's ruling that the requirements of the personal attack rule have been satisfied in this case.

AFFIRMED.

---

**19.** We note one additional fact raised in the petitioner's brief. The record indicates that sometime prior to March 10, 1981, Public Employees' Union Local # 61, a certified bargaining representative of Milwaukee's sanitation workers, sought to purchase broadcasting time on WTMJ–TV to air a thirty-second promotion on the duties of the Milwaukee sanitation workers. Pet.App. at 177–78. On March 10, 1981, this request was denied on the basis of a station policy that "[t]ime is not sold for the discussion of controversial issues." Pet.App. at 169–71. A similar policy was upheld in the case of *CBS v.*

*Democratic National Committee*, 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973), and we do not question the legality of WTMJ's policy here. However, because the union's request related to one of the issues of public importance involved in this case, we are troubled by the fact that WTMJ did not offer the union free time to air its view, or at least supplied the record in this case with some explanation for its actions. Nevertheless, its failure to do either is not sufficient grounds for a reversal of the Commission's decision.

POSNER, Circuit Judge, dissenting.

I would dismiss the petition for review rather than deny it. With all due respect to the contrary conclusion of my brethren, I submit that when someone who is not even a listener complains to the Federal Communications Commission that a television station has violated the Commission's "fairness doctrine," and the Commission finds no violation, the disappointed complainant has no right to petition for judicial review of the decision. The "injury" he suffers from the Commission's finding of no violation does not confer standing to sue, and in any event the Commission's order is unreviewable because it is agency action committed by law to agency discretion.

I make this submission with some diffidence. Several court of appeals opinions (mainly from the D.C. Circuit) allow such complainants to petition for judicial review, though without discussing the issues of standing and reviewability. See *Democratic Nat'l Comm. v. FCC*, 717 F.2d 1471 (D.C.Cir.1983); *American Security Council Education Foundation v. FCC*, 607 F.2d 438 (D.C.Cir.1979) (en banc); *Public Media Center v. FCC*, 587 F.2d 1322 (D.C. Cir.1978); *Council for Employment & Economic Energy Use v. FCC*, 575 F.2d 311 (1st Cir.1978); *Neckritz v. FCC*, 446 F.2d 501 (9th Cir.1971). One of these opinions (*Council for Employment*) states without elaboration that the petitioner was "aggrieved," 575 F.2d at 314—the wrong test, I shall argue. The others do not discuss standing or reviewability at all. A fifth case, *Office of Communication of United Church of Christ v. FCC*, 359 F.2d 994, 1000–06 (D.C.Cir.1966), discusses standing but, I shall argue, is distinguishable from this case.

I begin with the question of Mayor Maier's standing, thus reversing the order in which the standing and reviewability issues are discussed in the majority opinion. That opinion, after deciding that Congress wanted decisions such as the FCC's in this case to be judicially reviewable, argues that therefore *someone* must have standing to seek judicial review, as otherwise the congressional purpose would be thwarted. But this ignores the fact that the requirement of standing is constitutional; if any of the requirements of Article III of the Constitution for maintaining a case in federal court are not satisfied, and as a result an issue that Congress would like the court to review cannot be reviewed, that is just too bad. The approach in the majority opinion of putting reviewability before standing also ignores the fact that someone besides Maier—a listener for example— might, as I shall argue, have a better claim of standing to challenge the Commission's decision.

The Administrative Procedure Act provides, "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. If the Commission in this case had found that WTMJ had violated the fairness doctrine, and imposed some sanction (on the range of possible sanctions for violations of the doctrine see Simmons, The Fairness Doctrine and the Media 12, 15 n. 32 (1978)), the station would have had standing under the first part of section 702 to seek judicial review. The financial injury it would have suffered would be the kind of injury—personal, concrete, direct— on which common law suits are based; and thus, if wrongful, it would be an injury caused by a "legal wrong" within the meaning of section 702. See Attorney General's Manual on the Administrative Procedure Act 96 (1947). The station might have standing even if the Commission imposed no immediate sanction, for when the station's license was up for renewal the Commission might count a violation of the fairness doctrine against renewal, and nonrenewal would have devastating financial consequences for the station's owners. In either case the station would be an injured party in an uncontroversial sense and would have standing to seek judicial redress for its injury. See *Straus Communications, Inc. v. FCC*, 530 F.2d 1001, 1006–07 (D.C.Cir.1976); cf. *Bethlehem*

*Steel Corp. v. EPA,* 723 F.2d 1303, 1306 (7th Cir.1983).

This case is somewhat unusual because the person seeking judicial review is not a licensee but an unsuccessful complainant. We need to distinguish among three different types of disappointed complainant. The first is a member of the station's audience. The injury he suffers from a violation of the fairness doctrine, though somewhat tenuous and indistinct, is analogous to that of a customer who is overcharged; it . may therefore be concrete enough to confer standing. The second type of complainant is a member of the general public who, whether or not he watches the station, believes that its alleged violations of the fairness doctrine have harmed him indirectly by misleading the station's audience with regard to issues of public policy in which he has a stake. This type of injury is too tenuous to support standing under conventional principles, which require that a person wanting to maintain a suit in federal court have suffered an injury of the sort that would support a common law suit. See *People Organized for Welfare & Employment Rights v. Thompson,* 727 F.2d 167, 171 (7th Cir.1984), and cases cited there. The tort concept of remoteness of damage would rule out a common law suit based on an injury as speculative and indirect (much more so, for example, than even the "neighborhood effects" alleged in such cases as *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 376–78, 102 S.Ct. 1114, 1123–1124, 71 L.Ed.2d 214 (1982)) as this. Compare *Palsgraf v. Long Island R.R.,* 248 N.Y. 339, 162 N.E. 99 (1928); *Crankshaw v. Piedmont Driving Club,* 115 Ga.App. 820, 156 S.E.2d 208 (1967). The third type of injury that is relevant here is the injury suffered by a politician when unfair news coverage impairs his ability to do his job or his prospects for reelection. This is also too indirect an injury to support standing under conventional principles. Cf. *Winpisinger v. Watson,* 628 F.2d 133, 137–39 (D.C.Cir.1980). Otherwise a national political figure might have standing to challenge the Commission's rejection of a fairness complaint lodged with any television station in the nation that broadcast material critical of him.

Mayor Maier bases standing on the second and third types of injury. He does not sue as a representative of listeners, and could not, for he does not claim to be a listener who was confused as a result of the alleged violation of the fairness doctrine and he cannot sue as the representative of a class of persons to which he doesn't belong. See, e.g., *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979); *Minority Police Officers Ass'n v. City of South Bend,* 721 F.2d 197, 202 (7th Cir.1983). The other types of injury will not support standing under conventional principles; and though those principles have been severely bent in the judicial review of administrative action—section 702 being both ratification and encouragement of this tendency—the broadcast cases that discuss standing do not go so far as this court does today. A representative of the general public has been allowed to get judicial review of a sanction imposed on a broadcaster, on the theory that the public's right to be informed might be impaired as a result of the deterrent effect of the sanction, see *Illinois Citizens Comm. for Broadcasting v. FCC,* 515 F.2d 397, 402 (D.C.Cir.1975); but the petitioner represented listeners, see *id.* at 401, whom I earlier analogized to consumers. *Office of Communications of United Church of Christ v. FCC, supra,* 359 F.2d at 998–99, upheld the standing of a citizens' group to intervene to oppose the renewal of a station's license on the ground that the licensee had violated the fairness doctrine; but again the petitioner represented listeners. Also, the case arose under 47 U.S.C. § 402(b)(6), which allows "any ... person who is aggrieved or whose interests are adversely affected" by particular types of FCC orders to petition for review in the District of Columbia Circuit. This language, read together with the APA's section 702 ("adversely affected or aggrieved by agency action *within the meaning of a relevant statute*" (emphasis added)), con-

fers standing on persons who have not suffered a "legal wrong" in the traditional common law sense. But the present case does not arise under section 402(b)(6), it arises under section 402(a), which (read in conjunction with 28 U.S.C. § 2342(1)) merely gives this court jurisdiction to set aside certain FCC orders. It does not speak to standing. Section 2344 of the Judicial Code does refer to "any party aggrieved," but the function of that section is to assign judicial review jurisdiction to the courts of appeals, not to determine who has standing to seek judicial review.

Thus, even if (as is by no means clear) section 402(b)(6) was intended to (and can constitutionally) confer standing on one as remotely affected as Maier by the alleged violation of the fairness doctrine, he would have standing only if section 402(a) were intended to embody the same broad concept of standing as 402(b)(6), though worded differently. (The language comparing 402(a) and 402(b) that my brethren quote from *Scripps-Howard Radio, Inc. v. FCC,* 316 U.S. 4, 15–16, 62 S.Ct. 875, 882–883, 86 L.Ed. 1229 (1942), relates to a different question from any in the present case.) And before I would conclude that it was— ignoring the difference between the language of the two sections and the constitutional doubts that the suggested reading must give rise to—I would require greater evidence of congressional intent to expand standing in 402(a) to its uttermost constitutional limits (and maybe beyond) than I find. The language of section 402(b)(6) provides a handle for an expansionary interpretation of standing; the language of section 402(a) does not, and there is no legislative history that might fill the gap. True, *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970), can be read as redefining the words "within the meaning of a relevant statute" in the APA's section 702 to mean "within the zone of interests to be protected or regulated by the statute"; and the general public is within the zone of interests that the fairness doctrine (not a statute, but an administrative embellishment of a statute,

namely of the Communications Act of 1934) was intended to protect. But as Professor Currie has suggested, *Data Processing* may allow standing only where the statute (here section 402(a)) "is construed ... to provide an implicit remedy to members of the protected class." Currie, Federal Courts: Cases and Materials 60 (3d ed. 1982); see also Currie, *Misunderstanding Standing,* 1981 S.Ct.Rev. 41, 44. And there is no evidence for such a construction of section 402(a). (*Data Processing* is read more broadly, however, in Judge Scalia's article, *The Doctrine of Standing as an Essential Element of the Separation of Powers,* at p. 14, forthcoming in 17 Suffolk Univ.L.Rev., winter 1983.)

Standing as defined in section 702 and interpreted by Professor Currie merges with the question whether Congress wanted the courts to be able to review the administrative order in question; but as I said at the outset the two questions are logically distinct, and I turn now to the second. When section 402(a) was enacted back in 1934, the right of a complainant to an administrative agency to get judicial review of the agency's refusal to impose a sanction against the firm complained about was (and is still today) limited. The limitation is codified in the Administrative Procedure Act, which bars judicial review of "agency action ... committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Thus, not all agency action is reviewable, even if the requirement of standing in Article III of the Constitution is satisfied. It is true that there is a presumption of reviewability, but there are a number of areas where the presumption has failed to carry the day, and one of them is quite pertinent to this case. If you complain to the FTC that a competitor is hurting you by making false claims about your product (or his), and the FTC either refuses to issue a complaint against him or exonerates him after a proceeding, you cannot get judicial review of the Commission's action, even though you have suffered the type of injury that might support a common law suit and thus confer standing to sue, and even

if the Commission's decision is based on an explicit legal determination rather than on an exercise of prosecutorial discretion. See *ITT Continental Baking Co. v. FTC*, 515 F.2d 367 (D.C.Cir.1975). It is true that the evidence from both the structure and legislative history of the Federal Trade Commission Act that disappointed complainants were not to have rights of judicial review is stronger than anything in the Communications Act; but since the fairness doctrine was created by the FCC after the Act was passed (though a 1959 amendment to the Act indicates legislative recognition of the doctrine, see 47 U.S.C. § 315(a), Simmons, *supra*, at 51), you could not expect to find comparable evidence. It is also true that the FTC is (or at least was in its original form) a prosecutorial agency, and prosecutorial discretion is traditionally unreviewable. The FCC was modeled on public utility and common carrier regulatory agencies, which are umpires between consumer and supplier interests; and typically any disappointed party to a public utility or common carrier proceeding can get judicial review of the agency's action. But qua enforcer of the fairness doctrine in independent remedial proceedings that are not inspired by listeners' complaints (listeners being a group corresponding to consumers in public utility and common carrier cases) and that are distinct from license-renewal proceedings (as in *United Church of Christ*), the FCC is a prosecutor, rather than a regulator in the sense in which its broadcast-licensing and telephone-regulation functions are regulatory. Moreover, as I have said, the rule that FTC decisions dismissing complaints are not judicially reviewable applies even when the FTC bases dismissal on a legal determination rather than on the exercise of its prosecutorial discretion. The similarities between the FCC's role in a case like the present and the FTC's role when it dismisses a deceptive-advertising complaint after full proceedings thus are greater than the differences. And despite my brethren's remarks about the importance of preserving judicial review of agency action, we have gotten along quite nicely without judicial review of FTC decisions dismissing deceptive-advertising complaints, and would get along quite as well without judicial review of FCC decisions dismissing complaints under what is after all a doctrine that the FCC itself, and not Congress, created. We are busy enough as it is.

Of course if Congress has commanded us to review these decisions we must; but the fact that Congress alluded to the fairness doctrine in the 1959 amendment to section 315 of the Communications Act is not a congressional determination that decisions by the FCC dismissing fairness complaints are judicially reviewable. Judicial review was not the issue before Congress when it amended section 315; and to suppose that when members of Congress were thinking about the fairness doctrine they had present to their minds all the ancillary questions that the doctrine raises, such as whether the denial of a complaint under the doctrine is judicially reviewable, would ignore the realities of the legislative process. Moreover, I do not agree that in deciding the issue of reviewability we should give weight to the Commission's view on the question, assuming as I do not that its failure to object to judicial review constitutes a considered administrative interpretation of the statute. The fact that the Commission's view has never been stated but must be inferred, speculatively, from its silence, and the fact that the judicial-review provisions of the Communications Act are not among the provisions of that Act which the Commission is responsible for enforcing (they come into play only after the Commission has done its work), are sufficient objections to this course, and also underscore the artificiality of the suggestion that the "administrative construction" has been strengthened by Congress's refusal to alter it. Congress has never been asked to alter the construction, an implicit construction of which few if any members of Congress can ever have heard.

I have discussed the case so far as if Maier's complaint had been limited to an alleged violation of the fairness doctrine's generalized prohibition of unbalanced

broadcasting. But he also complains that he was the victim of a personal attack, which the doctrine prohibits separately. If my analogy between the FTC as a prosecutor of unfair trade practices and the FCC as a prosecutor of unfair broadcasting practices is correct, Maier's complaint about the Commission's failure to find a violation of the personal-attack doctrine is also unreviewable. He has a stronger argument on standing; the interest that the personal-attack doctrine protects is very similar to that protected by the law of defamation (Simmons, *supra*, at 88), and an interest that will support a common law suit will also support standing to get judicial review of agency action. But standing is not enough. The fact that Maier was singled out for attack by the station would no more entitle him to get judicial review of the Commission's rebuff of his personal-attack charge, in the face of the principle that agency action committed by law to agency discretion is unreviewable, than if Maier had been the target of a competitor's false advertising and had complained unsuccessfully to the FTC.