11 F.3d 1430
 62 USLW 2381, 22 Media L. Rep. 1001
 ARKANSAS AFL-CIO, and the Committee Against Amendment 2, Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
Radio-Television News Directors Association; KARK-TV;
National Association of Broadcasters; CBS, Inc.,
Intervenors.
 No. 92-1115.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 8, 1993.
Decided Dec. 7, 1993.
 
 Andrew Schwartzman, Washington, DC, argued, for committee against AFL-CIO.
 Timothy B. Dyk, Washington, DC, argued, for intervenor CBS. (Gigi B. Sohn, on brief), for petitioners.
 Daniel M. Armstrong, Associate General Counsel, F.C.C., Washington, DC, argued (Robert L. Pettit and C. Grey Pash, Jr., on brief), for respondents.
 Before RICHARD S. ARNOLD, Chief Judge, FLOYD R. GIBSON, Senior Circuit Judge, McMILLIAN, JOHN R. GIBSON, FAGG, BOWMAN, WOLLMAN, MAGILL, BEAM, LOKEN, HANSEN, and MORRIS S. ARNOLD, Circuit Judges.
 
 
 1
 BEAM, Circuit Judge, with whom FLOYD R. GIBSON, Senior Circuit Judge, BOWMAN, MAGILL and LOKEN, Circuit Judges, join.
 
 
 2
 This appeal arises from the Federal Communications Commission's ("FCC") refusal to apply the fairness doctrine to KARK-TV ("KARK"[1]). The FCC ruled that the fairness doctrine was not statutorily mandated, and was no longer in the public interest. Based on this determination, the FCC dismissed a fairness doctrine complaint filed by the Arkansas AFL-CIO and The Committee Against Amendment 2 (collectively "Committee"). A panel of this court affirmed. Arkansas AFL-CIO v. FCC, 980 F.2d 1190 (8th Cir.1992) (Gibson, J., dissenting). We granted the Committee's suggestion for rehearing en banc and vacated the panel opinion. Arkansas AFL-CIO v. FCC, 980 F.2d 1197 (8th Cir.1993). We now affirm the decision of the FCC.
 
 I. HISTORICAL BACKGROUND
 
 3
 The history of the fairness doctrine is not in dispute in this case and was thoroughly discussed in the panel opinion. Therefore, we briefly summarize the relevant background here.
 
 
 4
 The Radio Act of 1927, and its successor, the 1934 Communications Act, created a system under which the FCC grants licensees exclusive control of publicly owned frequencies. As a condition of their licenses, these licensees are required to operate their stations in the "public interest." See 47 U.S.C. Secs. 303, 307, 309, 315 (1991). The FCC is charged with the enforcement of the statute, including the requirement that licensees operate in the public interest.
 
 
 5
 The drafters of the 1927 Radio Act considered giving common carrier status to broadcast licensees, thereby requiring them to provide access to all on equal terms. This proposal was ultimately withdrawn, and there is no dispute that broadcasters are not common carriers. See Columbia Broadcasting Sys., Inc. v. Democratic Nat'l Comm., 412 U.S. 94, 105, 93 S.Ct. 2080, 2087, 36 L.Ed.2d 772 (1973). In 1929, in Great Lakes Broadcasting Co., the Radio Commission articulated its interpretation of "operation in the public interest" as requiring that a licensee provide:
 
 
 6
 ample play for the free and fair competition of opposing views and the Commission believes that the principle applies ... to all discussions of issues of importance to the public.
 
 
 7
 Great Lakes Broadcasting Co., 3 F.R.C.Ann.Rep. 32, 33 (1929), rev'd on other grounds, 37 F.2d 993 (D.C.Cir.), cert. denied, 281 U.S. 706, 50 S.Ct. 467, 74 L.Ed. 1129 (1930). Over time, this interpretation developed into the fairness doctrine, and became an integral part of the FCC's interpretation of its mandate. See Report on Editorializing by Broadcast Licensees, 13 F.C.C. 1246 (1949) (germinal statement of the fairness doctrine). The fairness doctrine consisted of a two-pronged obligation: the broadcaster must give adequate coverage to public issues, and that coverage must accurately reflect opposing views on the issues. See Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 377, 89 S.Ct. 1794, 1799, 23 L.Ed.2d 371 (1969) (upholding the constitutionality of the fairness doctrine).
 
 
 8
 In 1959, Congress amended section 315 of the Communications Act in response to an FCC decision, Lar Daly, 26 F.C.C. 715 (1959). In Lar Daly, the FCC ruled that any appearance on the airwaves by a candidate for political office triggered the equal time provision of section 315.[2] Fearing that such a rule would render ordinary news coverage impossible, Congress amended section 315 to exempt certain routine news events from the equal time provision. As part of that amendment, Congress also added the proviso:
 
 
 9
 Nothing in the foregoing sentence shall be construed as relieving broadcasters, in connection with the presentation of newscasts, news interviews, news documentaries, and on-the-spot coverage of news events, from the obligation imposed upon them under this chapter to operate in the public interest and to afford reasonable opportunity for the discussion of conflicting views on issues of public importance.
 
 
 10
 47 U.S.C. Sec. 315(a). Interpretation of this proviso is at the heart of the controversy now before the court.
 
 
 11
 From 1959 until 1981, the FCC consistently interpreted the 1959 amendment to section 315 as codifying the fairness doctrine and, therefore, treated the fairness doctrine as a part of the Communications Act. See, e.g., Letter to Oren Harris, 40 F.C.C. 582, 583 (1963); Obligations of Broadcast Licensees under the Fairness Doctrine, 23 F.C.C.2d 27, 28 (1970); 1974 Fairness Report, 48 F.C.C.2d 1, 2-9 (1974). In 1981, in response to perceived changes in the broadcasting industry, the FCC recommended that Congress amend section 315(a) to repeal the fairness doctrine. FCC News Release Report No. 5068 (September 17, 1981). Congress, however, did not take the requested action. In 1985, the FCC issued a Fairness Report which cast doubt on the continued constitutional validity of the fairness doctrine. That report also suggested that the longstanding assumption that the 1959 amendment codified the fairness doctrine was erroneous.
 
 
 12
 In 1986, the D.C. Circuit ruled that the 1959 amendment to section 315(a) had, in fact, not codified the fairness doctrine. Telecommunications Research & Action Ctr. v. FCC, 801 F.2d 501, rehearing en banc denied, 806 F.2d 1115 (D.C.Cir.1986), cert. denied, 482 U.S. 919, 107 S.Ct. 3196, 96 L.Ed.2d 684 (1987) ("TRAC "). The FCC subsequently purported to abolish the fairness doctrine on the grounds that it no longer served the public interest and that it violated the First Amendment. Syracuse Peace Council v. WTVH, 2 F.C.C.Rcd. 5043 (1987). Deferring to the FCC's determination that the fairness doctrine no longer served the public interest, the D.C. Circuit affirmed. Syracuse Peace Council v. FCC, 867 F.2d 654 (D.C.Cir.1989), cert. denied, 493 U.S. 1019, 110 S.Ct. 717, 107 L.Ed.2d 737 (1990). In doing so, the D.C. Circuit found that the actions of the FCC were not arbitrary or capricious, and did not constitute an abuse of agency discretion. Id. at 669.
 
 II. PROCEDURAL HISTORY
 
 13
 The proceedings before the FCC in this case, In re complaint of The Arkansas AFL-CIO and The Committee Against Amendment 2 against Television Station KARK-TV, Little Rock, Arkansas, FCC No. 91-434 (released January 6, 1992), arose from a dispute about coverage of a ballot issue voted upon by the people of Arkansas in November, 1990. The Committee filed a complaint with the FCC alleging that KARK-TV was violating the fairness doctrine in its coverage of the Amendment 2 ballot issue.
 
 
 14
 In a 3-2 ruling, the FCC dismissed the Committee's complaint. Relying on TRAC, the FCC reiterated its conclusion that section 315 of the Communications Act of 1934 did not codify the fairness doctrine. The FCC further stated that the fairness doctrine had been repealed in Syracuse Peace Council. After conducting an independent analysis of the statutory construction issue, a panel of this court affirmed the decision of the FCC, albeit on different grounds. The Committee moved for rehearing en banc under Fed.R.App.P. 35(a). The FCC also requested rehearing en banc.
 
 
 15
 The posture of the case now before us en banc is somewhat confusing. To the panel, the FCC defended its decision to dismiss the Committee's complaint on the grounds that the 1959 amendment unambiguously did not codify the fairness doctrine and that the FCC had abolished the doctrine in Syracuse Peace Council. The panel concluded that the language of the 1959 amendment was facially ambiguous, but that the legislative history made it clear that Congress had not intended to codify the fairness doctrine. Therefore, the panel found that the FCC properly concluded that the 1959 amendment had not codified the fairness doctrine. To the en banc court, the FCC abandoned its argument that the 1959 amendment clearly and unambiguously did not codify the fairness doctrine. The FCC now argues that the United States Supreme Court holding in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) mandates a remand of the case to permit the FCC to reconsider its decision in light of the panel's statutory interpretation. Since the Committee also contends that remand is required under Chevron, the FCC moved for a realignment of the parties. We granted that motion.
 
 III. DISCUSSION
 
 16
 The Committee raises two issues for en banc review. First it contends that the 1959 amendment clearly and unambiguously codified the fairness doctrine. In the alternative, the Committee argues that Chevron dictates that this case be remanded to the agency. The FCC joins the Committee in this second argument and urges us to remand the case for reconsideration in light of the panel's statutory interpretation. KARK argues for affirmance and also suggests that the case should be dismissed as moot.
 
 
 17
 The FCC decided two different issues in the case before it: (a) whether the fairness doctrine was codified, and (b) if not, whether the elimination of the fairness doctrine was an appropriate exercise of the FCC's discretion to implement the public interest requirement of the statute. The parties have commingled these issues, but we will discuss them separately.
 
 A. Mootness
 
 18
 The judicial power of the federal courts is restricted by Article III of the Constitution to cases and controversies. This court has defined a "case or controversy" to require: "a definite and concrete controversy involving adverse legal interests at every stage in the litigation." McFarlin v. Newport Special Sch. Dist., 980 F.2d 1208, 1210 (8th Cir.1992). The controversy must be one for which the court can grant specific and conclusive relief. Id. Occasionally, due to the passage of time or a change in circumstance, the issues presented in a case will no longer be "live" or the parties will no longer have a legally cognizable interest in the outcome of the litigation. When such changes prevent a federal court from granting effective relief, the case becomes moot. See Murphy v. Hunt, 455 U.S. 478, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982) (per curiam); Carson v. Pierce, 719 F.2d 931, 933 (8th Cir.1983). Mootness therefore acts as a jurisdictional bar, and must be considered before reaching the merits of the case.
 
 
 19
 KARK argues that this case is moot because the ballot issue which gave rise to this litigation has long been decided. It contends that even if the Committee should prevail on the merits, this court could not grant them any relief. We disagree. While mootness is a close question in this case, the Committee has shown that this controversy falls within an exception to the mootness doctrine because it is "capable of repetition yet evading review." See Weinstein v. Bradford, 423 U.S. 147, 148-49, 96 S.Ct. 347, 347, 46 L.Ed.2d 350 (1975) (per curiam) (citing Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911)).
 
 
 20
 Under that exception, federal courts are permitted to hear an otherwise moot case when: (1) the challenged action is of too short a duration to be litigated fully prior to its cessation or expiration; and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again. McFarlin, 980 F.2d at 1211. This exception does not apply merely because the issue might recur in another case with different parties. Id. The parties must demonstrate a reasonable expectation that the event complained of will recur with respect to themselves. Id.; see also Gay & Lesbian Students Ass'n v. Gohn, 850 F.2d 361, 365 (8th Cir.1988). They need not prove with certainty that the situation will recur, but a mere physical or theoretical possibility is insufficient to overcome the jurisdictional hurdle of mootness. Murphy v. Hunt, 455 U.S. at 482, 102 S.Ct. at 1183.
 
 
 21
 The Committee unquestionably satisfies the first prong of the test for a controversy that is "capable of repetition yet evading review." Ballot issues are notorious examples of this situation. See, e.g., Norman v. Reed, --- U.S. ----, ---- - ----, 112 S.Ct. 698, 704-05, 116 L.Ed.2d 711 (1992); Storer v. Brown, 415 U.S. 724, 737 n. 8, 94 S.Ct. 1274, 1282 n. 8, 39 L.Ed.2d 714 (1974); Moore v. Ogilvie, 394 U.S. 814, 816, 89 S.Ct. 1493, 1494, 23 L.Ed.2d 1 (1969); see also, Branch v. FCC, 824 F.2d 37, 41 n. 2 (D.C.Cir.1987) (controversies arising in election campaigns are unquestionably among those saved from mootness under the "capable of repetition yet evading review" exception), cert. denied, 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988); Libertarian Party v. Bond, 764 F.2d 538, 539 n. 1 (8th Cir.1985) (controversy not moot despite the fact that election had already taken place where the controversy is capable of repetition yet evading review). While the issue in this case, codification of the fairness doctrine, is tangential to the ballot issue, the same reasoning applies. If the Committee is forced to wait until the next ballot issue to contest the FCC's decision, it will face time constraints similar to those that prevented the resolution of this case before the 1990 election. See King Broadcasting Co. v. FCC, 860 F.2d 465, 471 n. 8 (D.C.Cir.1988). Thus, the issue of the continued viability of the fairness doctrine with regard to ballot issues would never be resolved if we found this case to be moot.[3]
 
 
 22
 The second prong of the "capable of repetition yet evading review" exception, a reasonable expectation that the same party will be subject to a future action, presents a closer question. However, we think that the Committee has alleged sufficient facts to prevent a finding of mootness. The Committee contends that this controversy will recur with regard to the station's coverage of the continuing public debate on the issue underlying Amendment 2 as well as with regard to other ballot issues.[4] The letters appended to the Committee's Reply Brief demonstrate that while this case was pending, the parties were involved in another dispute over fairness requirements in the context of a different ballot issue. See Committee's Reply Brief, Appendix A. We think the fact that the situation has already recurred once, coupled with the Committee's assertion that they expect further recurrences, satisfies the second prong of the test. See Norman v. Reed, --- U.S. at ----, 112 S.Ct. at 705. Therefore, we find that this case is not moot.
 
 
 23
 KARK raises a number of other arguments in support of its contention that this court lacks jurisdiction to decide this case. We find these arguments meritless.[5]
 
 B. Codification
 
 24
 In its decision dismissing the Committee's complaint, the FCC relied on TRAC for the proposition that section 315 "is clear on its face that the fairness doctrine is not codified." Arkansas AFL-CIO v. KARK-TV, FCC No. 91-434, pp. 3-4. The Committee challenged that determination. The panel agreed with the Committee that the TRAC decision did not fully consider the issue, and conducted its own review of the 1959 amendment to section 315 and of the accompanying legislative history. Based on that analysis, the panel affirmed the FCC's decision that the fairness doctrine was not codified by the 1959 amendment. To the en banc court, the Committee contends that the plain language of the statute, coupled with the unambiguous legislative history, indicates congressional intent to codify the fairness doctrine. We disagree. Having examined the reasoning employed by the panel, as well as the reasoning of the TRAC court, we are convinced that the language of the 1959 amendment to section 315(a) is ambiguous but that the legislative history makes it clear that the amendment does not codify the fairness doctrine.[6]
 
 
 25
 As noted, section 315(a) was amended in 1959 to exempt certain appearances on news programs from the general requirement that equal time be accorded to all political candidates. The 1959 amendment also contained the following proviso:
 
 
 26
 Nothing in the foregoing sentence shall be construed as relieving broadcasters, in connection with the presentation of newscasts, news interviews, news documentaries, and on-the-spot coverage of news events, from the obligation imposed upon them under this chapter to operate in the public interest and to afford reasonable opportunity for the discussion of conflicting views on issues of public importance.
 
 
 27
 47 U.S.C. Sec. 315(a). To find the intent of Congress, the Committee focuses on the language in this proviso which indicates that licensees have an: "obligation imposed upon them under this chapter to ... afford reasonable opportunity for the discussion of conflicting views on issues of public importance." This language is offered as evidence that Congress incorporated the fairness doctrine into the statute, thus converting an administrative policy into a statutory mandate. For many years, the FCC adhered to this interpretation. While we do not deny that the Committee's interpretation is reasonable, we are not persuaded that it is correct.
 
 
 28
 We think that Congress included this proviso as a savings clause to insure that the 1959 amendment did not unintentionally dismantle the FCC's fairness doctrine.[7] See TRAC, 806 F.2d at 1119 (Bork, J. concurring). The introductory phrase of this proviso states: "[n]othing in the foregoing sentence shall be construed as relieving broadcasters ... from the obligation imposed upon them under this chapter...." This wording indicates to us that the proviso was intended to maintain the status quo, rather than to impose any new statutory obligations. The language merely ensures that any obligation existing before the amendment would continue unchanged.
 
 
 29
 Since we find at least two reasonable interpretations of the statutory language, the most we can say on behalf of the Committee's codification argument is that the statute is facially ambiguous. After an examination of the relevant legislative history, however, we are forced to conclude that the Committee's contention that the 1959 amendment codified the fairness doctrine is in error.
 
 
 30
 The Senate and the House adopted very different language in their respective bills amending section 315(a). The House version amended section 315(a) by adding the following sentence:
 
 
 31
 Appearance by a legally qualified candidate on any bona fide newscast (including news interviews) or on any on-the-spot coverage of news events (including but not limited to political conventions and activities incidental thereto), where the appearance of the candidate on such newscast, interview, or in connection with such coverage is incidental to the presentation of news, shall not be deemed to be use of broadcasting station [sic] within the meaning of this subsection.
 
 
 32
 Conference Report No. 1069, 86th Cong. 1st Sess., reprinted in 1959 U.S.C.C.A.N. 2564, 2582. The House substitute did not mention fairness, and contained no language that could be viewed as an attempt to codify the fairness doctrine. Instead, the House substitute merely exempted certain news reports from the purview of section 315, leaving the rest of the statute unchanged.
 
 
 33
 The Proxmire amendment to the Senate version of the bill differed dramatically from this House language. The Senate version would have added the following to section 315(a):
 
 
 34
 Appearance by a legally qualified candidate on any newscast, news interview, news documentary, on-the-spot coverage of news events, shall not be deemed to be use of a broadcasting station within the meaning of this subsection, but nothing in this sentence shall be construed as changing the basic intent of Congress with respect to the provisions of this Act, which recognizes that television and radio frequencies are in the public domain, that the license to operate in such frequencies requires operation in the public interest, and that in newscasts, news interviews, news documentaries, on-the-spot coverage of news events, all sides of public controversies shall be given as fair an opportunity to be heard as is practically possible.
 
 
 35
 Id. (emphasis added). The Senate version explicitly asserted that the fairness doctrine was part of the statute. Had Congress adopted this language, our analysis would be different. See Red Lion, 395 U.S. at 383-84, 89 S.Ct. at 1803. (Senator Proxmire's amendment "constituted a positive statement of doctrine and was altered to the present merely approving language in the conference committee.")
 
 
 36
 Congress did not, however, adopt the Proxmire amendment as contained in the Senate version of the bill. In reconciling the two drafts, the conference committee deleted the Senate language and substituted the previously mentioned proviso. The Conference Report further stated:
 
 
 37
 The conferees feel that there is nothing in this language which is inconsistent with the House substitute.
 
 
 38
 Id. Therefore, we cannot find that Congress intended the language of the amendment to create any new statutory obligation since there was no mention of such an obligation in the House Report. See Donovan v. Rose Law Firm, 768 F.2d 964, 974 (8th Cir.1985) (when forced to choose between a Senate report and a conference committee report to ascertain the intent of Congress, the better practice is to rely on the conference committee report).
 
 
 39
 The Committee also contends that a decision that the fairness doctrine is not codified will conflict with Supreme Court precedent and with the precedent of the majority of other circuits. We interpret the case law on the fairness doctrine differently.
 
 
 40
 In Red Lion, the Supreme Court upheld the fairness doctrine as a constitutionally permissible agency policy. The Committee contends that the Red Lion court also held that the 1959 amendment codified the fairness doctrine. We disagree. Red Lion contains dicta that could be interpreted to support the view that the 1959 amendment codified the fairness doctrine. See, e.g., id. 395 U.S. at 380, 89 S.Ct. at 1801 ("[t]he fairness doctrine finds specific recognition in statutory form...."); id. at 381, 89 S.Ct. at 1802 ("[h]ere the Congress has not just kept its silence by refusing to overturn the administrative construction, but has ratified it with positive legislation"); id. at 382, 89 S.Ct. at 1803 ("[t]he objectives of Sec. 315 themselves could readily be circumvented but for the complementary fairness doctrine ratified by Sec. 315"). However, these statements are counter-balanced by others tending to support the contrary view that the 1959 amendment merely expressed congressional approval for the administrative system of fairness. See, e.g., id. at 380, 89 S.Ct. at 1801 ("[i]n other words, the amendment vindicated the FCC's general view that the fairness doctrine inhered in the public interest standard"); id. at 385, 89 S.Ct. at 1804 ("we think the fairness doctrine ... [is] a legitimate exercise of congressionally delegated authority"). These apparent contradictions are all dicta; the issue of the codification of the fairness doctrine was not squarely before the Court in Red Lion. Our analysis is borne out by later Supreme Court opinions. In Columbia Broadcasting Sys., 412 U.S. at 113 n. 12, 93 S.Ct. at 2092 n. 12, for example, the Supreme Court described the 1959 amendment as giving "statutory approval to the Commission's fairness doctrine."
 
 
 41
 In addition to Red Lion, Columbia Broadcasting, and TRAC, a few other opinions touch on whether the 1959 amendment to section 315(a) of the Communications Act codifies the fairness doctrine. However, codification of the fairness doctrine was not at issue in any of those cases. Prior to TRAC, it was merely assumed that the 1959 amendment to section 315(a) codified the fairness doctrine.[8] This position was taken by the FCC, and the court decisions reflect that assumption. However, no court prior to TRAC actually reached a holding on the issue.
 
 
 42
 For example, the Seventh Circuit described the 1959 amendment in dicta as explicitly including the fairness doctrine in the Communications Act, and ratifying the doctrine with positive legislation. Maier v. FCC, 735 F.2d 220, 223 n. 4, 5 (7th Cir.1984). The Maier court relied on Red Lion as authority for those statements. As we have already discussed, the issue of statutory codification was not before the Court in Red Lion, and therefore, these comments in Maier are not conclusive. The Fourth Circuit described the 1959 amendment as "provid[ing] a statutory basis for the Commission's pre-existing version of the fairness doctrine." Larus & Bro. Co. v. FCC, 447 F.2d 876, 882 (4th Cir.1971). On the other hand, the First Circuit stated, again in dicta, that the 1959 amendment merely approved the general tenets of the fairness doctrine. Public Interest Research Group v. FCC, 522 F.2d 1060, 1066 (1st Cir.1975), cert. denied, 424 U.S. 965, 96 S.Ct. 1458, 47 L.Ed.2d 731 (1976).
 
 
 43
 Reading all of the cases together, we think that they reflect some uncertainty about the status of the fairness doctrine, rather than an unalloyed conclusion that the 1959 amendment to section 315(a) codified the doctrine. Thus, our decision in this case does not conflict with either Supreme Court precedent or the decisions of the other circuits.
 
 
 44
 Having concluded that the 1959 amendment to section 315(a) did not codify the fairness doctrine, we turn to the Committee's contention that a remand to the FCC is warranted. The Committee asserts that this court oversteps its authority by deciding the statutory codification issue on grounds other than those provided by the FCC. As support for this theory, the Committee relies on SEC v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943).
 
 
 45
 We think that the Committee misreads Chenery. In that case, the SEC applied broad equitable principles to a fiduciary carrying out a corporate reorganization. In doing so, the SEC made no factual findings with regard to misuse of the fiduciary position, honesty, fair dealings or fair pricing. Thus, the SEC recited no factual grounds for the decision it made. On appeal, the reviewing court supplied its own factual findings and affirmed the SEC. The Supreme Court reversed, noting that only the SEC was authorized to make the requisite factual findings under the regulatory scheme involved. However, the Supreme Court clearly limited Chenery to situations in which the agency failed to make a necessary determination of fact or of policy. Id. The Chenery Court expressly stated:
 
 
 46
 we do not disturb the settled rule that, in reviewing the decision of a lower court, it must be affirmed if the result is correct although the lower court relied upon a wrong ground or gave a wrong reason. The reason for this rule is obvious. It would be wasteful to send a case back to a lower court to reinstate a decision which it had already made but which the appellate court concluded should properly be based on another ground.
 
 
 47
 Id. at 88, 63 S.Ct. at 459 (citation omitted). The codification question we face involves neither a determination of fact nor a determination of policy. We therefore find the Committee's reliance on Chenery to be misplaced.
 
 
 48
 Finally, the Committee suggests that by affirming the FCC's decision on a basis other than that provided by the agency we run afoul of Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). We are frankly puzzled by this contention. Regardless of whether we employ our own reasoning, or adopt the reasoning from TRAC, the result is the same; the fairness doctrine is not codified. Under Chevron, a reviewing court must first employ the "traditional tools of statutory construction" to determine whether Congress has expressed a clear intent on the issue at hand. Id. at 843 n. 9, 104 S.Ct. at 2781 n. 9.
 
 
 49
 Chevron did not enumerate the "traditional tools" to be applied by the reviewing court in its quest for the intent of Congress, but the analysis conducted by the Chevron Court has been the road map for other courts. In the course of a Chevron analysis, a court must first consider the actual words of the statute. Chevron, 467 U.S. at 843, 104 S.Ct. at 2781 (the starting point for the interpretation of a statute must be its plain language.) If the intent of Congress is clear from the plain language of the statutory provision, that will be the end of the judicial inquiry. Id. If analysis of the statutory language does not yield an unambiguous congressional intent, the court should then look to the legislative history.[9] If congressional intent is clearly discernable, the agency must act in accordance with that intent and the court need not defer to the agency's interpretation of its mandate. K Mart Corp. v. Cartier Inc., 486 U.S. 281, 291, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988); see also Chevron, 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9 ("the judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.")
 
 
 50
 Therefore, we have not usurped any agency prerogative, but have merely provided an additional legal basis for a correct legal result. It is only when we turn to the second FCC finding, that "operation in the public interest" does not require the fairness doctrine, that the FCC has exercised its discretion and therefore that Chevron deference becomes an issue.
 
 C. Operation in the Public Interest
 
 51
 In the Syracuse Peace Council cases, the FCC articulated its reasons for finding that the fairness doctrine no longer served the public interest. The Committee contends that Syracuse Peace Council was wrongly decided and that even if the decision was correct, it need not be extended to eliminate fairness requirements with regard to ballot issues. The FCC rejected this argument below. The Committee also argues that the FCC's denial of its fairness petition was arbitrary and capricious and therefore that this court should accord no deference to the FCC decision.
 
 
 52
 Deference to an agency becomes an issue when the first part of a Chevron analysis does not yield a clear congressional intent. Chevron, 467 U.S. at 843, 104 S.Ct. at 2781. In such cases, Congress delegated the interpretation and development of the statutory provision to the discretion of the agency charged with enforcing the statute. Id. Therefore, Chevron requires that a reviewing court defer to the agency's interpretation of an ambiguous statute if that interpretation is "permissible." Good Samaritan Hosp. v. Shalala, --- U.S. ----, 113 S.Ct. 2151, 2157, 124 L.Ed.2d 368 (1993). In order to be "permissible," the agency's construction of the statute must be reasonable. Chevron, 467 U.S. at 844, 104 S.Ct. at 2782. As long as the interpretation proposed by the agency is reasonable, a reviewing court cannot replace the agency's judgment with its own. Therefore, we cannot balance policy considerations, or choose among competing interests when evaluating the reasonableness of an agency action.[10] See EEOC v. Commercial Office Products Co., 486 U.S. 107, 108 S.Ct. 1666, 100 L.Ed.2d 96 (1988).
 
 
 53
 We conclude that Congress did not codify the fairness doctrine in 1959. Therefore, our review of the FCC's decision to eliminate the doctrine is limited to a determination of whether the FCC has reasonably interpreted the statutory requirement that licensees operate in the public interest. See INS v. Cardoza-Fonseca, 480 U.S. 421, 446 n. 29, 107 S.Ct. 1207, 1220 n. 29, 94 L.Ed.2d 434 (1987). The Committee, and on rehearing the FCC, seem to claim that prong two of Chevron requires a more critical analysis than Supreme Court precedent would permit.
 
 
 54
 Under the 1934 Communications Act, the FCC is charged with interpreting the statutory mandate that stations operate in the public interest. For years, the FCC interpreted "operate in the public interest" as requiring the fairness doctrine. However, it is within the FCC's discretion to alter its interpretation of "operate in the public interest" in light of changed circumstances. Good Samaritan Hospital, --- U.S. at ----, 113 S.Ct. at 2159.[11] As long as the FCC's interpretation is consistent with its prior analysis, or cogently explains any change, the FCC may alter its interpretation of "operate in the public interest" to meet the changing realities of the broadcast industry. See FCC v. WNCN Listeners Guild, 450 U.S. 582, 596, 101 S.Ct. 1266, 1275, 67 L.Ed.2d 521 (1981) (courts must accord substantial deference to the FCC's judgment as to how the public interest is best served because the weighing of policies under the public interest standard is a task specifically delegated to them).
 
 
 55
 The Committee contends that an affirmance of the FCC's decision is incompatible with the Supreme Court's directives for the second strand of a Chevron inquiry. They argue that the FCC's interpretation of "operate in the public interest" to permit the abolition of the fairness doctrine was neither reasonable nor permissible. They also claim that the record before this court is inadequate to evaluate the challenged agency action. Therefore, the Committee asserts that a remand is required under Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744, 105 S.Ct. 1598, 1607, 84 L.Ed.2d 643 (1985) ("if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation"). We disagree with the Committee's contention that the FCC advanced no explanation for its decision, and therefore find remand to be unnecessary.
 
 
 56
 The FCC clearly articulated its reasons for abandoning the fairness doctrine in Syracuse Peace Council, and invoked those same reasons in this case. See Syracuse Peace Council v. WTVH, 2 FCC Rcd. 5043 (1987), aff'd., Syracuse Peace Council v. FCC, 867 F.2d 654 (D.C.Cir.1989), cert. denied, 493 U.S. 1019, 110 S.Ct. 717, 107 L.Ed.2d 737 (1990). In Syracuse Peace Council, the D.C. Circuit credited the FCC's testimony that the dramatic increase in media outlets since 1959 eliminated the need for the fairness doctrine. In addition, the FCC presented testimony that the fairness doctrine actually chilled speech. We think this kind of judgment about the way the world of broadcasting works is precisely the type of determination that the FCC is better equipped to make than are the courts. The reasons advanced by the FCC in Syracuse Peace Council are undeniably reasonable explanations for the change in agency position. Therefore, while Syracuse Peace Council does not bind this court, we agree with that well-reasoned decision, and find the elimination of the fairness doctrine to be a permissible agency response to changed circumstances.
 
 
 57
 We also reject the Committee's contention that the FCC did not articulate the reasons for its decision below. The FCC cited Syracuse Peace Council and that sufficed to identify the reasoning behind its decision in this case. We will not require the FCC to reinvent the wheel in each case and engage in endless repetitions of its reasoning. We note, however, that our decision in no way implicates the FCC's discretion to determine whether "operate in the public interest" requires some notion of fairness. The fairness doctrine developed from the "operate in the public interest" requirement and that language is still part of the statute. The FCC is free to reasonably interpret this statutory mandate as it sees fit.[12]
 
 IV. CONCLUSION
 
 58
 For the reasons stated above, the decision of the FCC is affirmed.
 
 
 59
 RICHARD S. ARNOLD, Chief Judge, with whom LOKEN and MORRIS SHEPPARD ARNOLD, Circuit Judges, join, concurring in the judgment.
 
 
 60
 The arguments in Judge Beam's lead opinion and Judge John R. Gibson's dissent seem to me very nearly evenly balanced. The choice between these able presentations is difficult. For me, the balance is tipped by the First Amendment.
 
 
 61
 Statutes should be interpreted, if possible, to avoid doubts about their constitutionality. NLRB v. Catholic Bishop of Chicago, 440 U.S. 490, 500, 99 S.Ct. 1313, 1318, 59 L.Ed.2d 533 (1979). We know that a law imposing an obligation of fairness on editorial decisions is invalid as applied to print media. Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974). We also know that, as of 1969, the Supreme Court did not think that the same result followed as to broadcasting. Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). The Red Lion holding, however, was premised on the scarcity of broadcast frequencies available for licensing, and the Court's opinion explicitly indicated that its view might change if more spectrum space became available, or if experience with the fairness doctrine indicated that it was reducing rather than enhancing the amount of information available to the public. Id. at 393, 399, 89 S.Ct. at 1808, 1811. See also FCC v. League of Women Voters, 468 U.S. 364, 376 n. 11, 104 S.Ct. 3106, 3115 n. 11, 82 L.Ed.2d 278 (1984) (Red Lion might be reconsidered upon some appropriate signal from Congress or the FCC).
 
 
 62
 Developments since 1969 make it likely, in my view, that the holding of Red Lion would be reconsidered. For one thing, the FCC has given the "signal" referred to in League of Women Voters, supra. The Commission has indicated both that the problem of spectrum scarcity is rapidly disappearing and that the fairness doctrine has had a chilling effect on the willingness of broadcast stations to cover controversial matters of public importance. See Syracuse Peace Council v. WTVH, 2 F.C.C.Rcd. 5043 (1987), aff'd, 867 F.2d 654 (D.C.Cir.1989), cert. denied, 493 U.S. 1019, 110 S.Ct. 717, 107 L.Ed.2d 737 (1990); Fairness Doctrine Obligations of Broadcast Licensees, 102 F.C.C.2d 143 (1985). Whether the Supreme Court reexamines Red Lion is its business, not ours. But developments subsequent to Red Lion appear at least to raise a significant possibility that the First Amendment balance struck in Red Lion would look different today. There is something about a government order compelling someone to utter or repeat speech that rings legal alarm bells. The Supreme Court believed, almost 25 years ago, that broadcasting was sufficiently special to overcome this instinctive feeling of alarm. In my opinion, there is a good chance that the legal landscape has changed enough since that time to produce a different result. In order to avoid having to reach this important constitutional question, I would construe the statute not to require the Commission to impose the fairness doctrine.
 
 
 63
 For these reasons, I concur in the judgment of the Court, affirming the order of the Federal Communications Commission in this case.
 
 
 64
 JOHN R. GIBSON, Circuit Judge, with whom McMILLIAN, FAGG, WOLLMAN and HANSEN, Circuit Judges, join, dissenting.
 
 
 65
 I respectfully dissent.
 
 
 66
 I agree with the lead opinion today that this case is not moot. I also agree that we should reject the D.C. Circuit's analysis of section 315 in TRAC v. FCC, 801 F.2d 501 (1986), cert. denied, 482 U.S. 919, 107 S.Ct. 3196, 96 L.Ed.2d 684 (1987). I differ, however, with the lead opinion's analysis of the 1959 amendment to section 315, particularly when it discusses the House conference report. The full statement from that report is: "The conferees feel that there is nothing in this language which is inconsistent with the House substitute. It is a restatement of the basic policy of the 'standard of fairness' which is imposed on broadcasters under the Communications Act of 1934." H.R.Conf.Rep. No. 1069, 86th Cong., 1st Sess. (1959), reprinted in, 1959 U.S.C.C.A.N. 2582, 2584.
 
 
 67
 The lead opinion today makes clear that the language of the 1959 amendment to section 315(a) is ambiguous, but finds clarity in the statute from its legislative history. The lead opinion contends the phrase "[n]othing in the foregoing sentence shall be construed as relieving broadcasters ... from the obligation imposed upon them under this chapter...." expresses Congress' intent to merely authorize then-existing FCC policy.
 
 
 68
 The language the conference committee substituted clearly states that broadcasters are not relieved "from the obligation imposed upon them under this Act to operate in the public interest and to afford reasonable opportunity for the discussion of conflicting views on issues of public importance." Id. That this language mandates the fairness doctrine is confirmed by the conference report passage I have cited above and particularly its reference "to the 'standard of fairness' which is imposed on broadcasters under the Communications Act of 1934." Conf.Rep. No. 1069, 1959 U.S.C.C.A.N. 2584.
 
 
 69
 Although the conference report is the strongest expression of congressional intent as to the meaning of a statute, the statements by members of Congress during discussion of the conference report specifically reaffirmed the viability of the fairness doctrine. Senator Scott, a Senate Conferee stated: "We have maintained very carefully the spirit of the Proxmire amendment." 105 Cong.Rec. 17831 (1959). Congressman Oren Harris, Chairman of the House Committee who reported the bill, stated that section 315 "reaffirmed the 'standard of fairness' established under the [Act]." Id. at 17778. These statements are not isolated examples. See TRAC v. FCC, 806 F.2d 1115, 1116-18 (D.C.Cir.1986) (Mikva, J., dissenting from denial of rehearing en banc) (reiterating numerous statements expressing similar interpretation of the bill).
 
 
 70
 I further believe that Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), sets forth a stronger view of congressional intent than does the court today. The following passages support my conclusion: "[I]n adopting the new regulations the Commission was implementing congressional policy rather than embarking on a frolic of its own." Id. at 375, 89 S.Ct. at 1799. "The fairness doctrine finds specific recognition in statutory form, is in part modeled on explicit statutory provisions relating to political candidates, and is approvingly reflected in legislative history." Id. at 380, 89 S.Ct. at 1801.
 
 
 71
 After setting out the specific statutory language substituted in conference, the Court continues: "This language makes it very plain that Congress, in 1959, announced that the phrase 'public interest,' which had been in the Act since 1927, imposed a duty on broadcasters to discuss both sides of controversial public issues. In other words, the amendment vindicated the FCC's general view that the fairness doctrine inhered in the public interest standard." Id. "Here, Congress has not just kept its silence by refusing to overturn the administrative construction, but has ratified it with positive legislation. Thirty years of consistent administrative construction left undisturbed by Congress until 1959, when that construction was expressly accepted, reinforce the natural conclusion that the public interest language of the Act authorized the Commission to require licensees to use their stations for discussion of public issues...." Id. at 381-82, 89 S.Ct. at 1802 (footnote omitted). Justice White's opinion in Red Lion then recited portions of the legislative history. Id. at 383-84, 89 S.Ct. at 1803.
 
 
 72
 The lead opinion disposes of Red Lion by relying on other statements in that decision which suggest that the Act merely authorized the Commission to adopt the fairness doctrine. Admittedly, there is some language to support this view. After carefully examining Red Lion, however, I see far more support for the proposition that the Court saw the bill as a congressional ratification of the fairness doctrine.
 
 
 73
 The idea that the fairness doctrine rests squarely on an affirmative congressional mandate is not new. From 1959 until 1981, the FCC consistently interpreted the 1959 amendment as codifying the doctrine. Indeed, in 1981 the FCC sought to repeal the doctrine through legislative, not agency, action. As late as 1985 the Commission denied that "it had the authority without further Congressional action to eliminate the fairness doctrine." TRAC, 806 F.2d at 1118 (Mikva, J., dissenting from denial of rehearing en banc) (citing FCC News Rept. No. DC-185 (Aug. 7, 1985)). Only after the FCC's attempts to obtain congressional action failed did the FCC first contend that Congress had never codified the doctrine.
 
 
 74
 As the lead opinion points out, the fairness doctrine has roots extending back to 1927, and it was applied until 1985, when the Commission departed from it. The effect of abandoning this doctrine is highlighted by the following comment from Justice White's opinion in Red Lion: "Otherwise, station owners and a few networks would have unfettered power to make time available only to the highest bidders, to communicate only their own views on public issues, people and candidates, and to permit on the air only those with whom they agreed." Id. 395 U.S. at 392, 89 S.Ct. at 1807-08. In this day of single issue constituencies, this language has telling force.
 
 
 75
 I need not discuss the issues in further detail, but I have found the discussion in Judge Mikva's dissent from the denial of rehearing en banc in TRAC v. FCC, 806 F.2d 1115 (D.C.Cir.1986), to be particularly instructive.
 
 
 76
 I would be content to simply rest with this expression of my views of section 315, but the request for a remand requires careful consideration. This court today rejects the request by the Committee and the FCC to remand to the Commission for further proceedings, and errs in so doing.
 
 
 77
 Before us on rehearing en banc, the FCC takes the position that its reasoning was incomplete in its initial decision in this case when it held that section 315 was unambiguous and did not codify the fairness doctrine. The Commission's initial rejection of the Committee's section 315 codification argument contained only the following explanation:
 
 
 78
 In 1985, the Commission said that section 315 was subject to varying interpretations as to whether the doctrine was codified. We now have been convinced by the analysis in TRAC v. FCC ... that section 315 is clear on its face that the fairness doctrine is not codified. Nothing in the legislative history persuades us otherwise. On this basis, therefore, we decline to award relief for which complainants argue.
 
 
 79
 The lead opinion today definitively rejects the TRAC analysis. Thus, to the extent the FCC gave specific reasons for its rejection of the Committee's claim, those reasons are struck down by today's decision. The lead opinion's rejection of the agency's reasoning provides sufficient basis for a remand. See SEC v. Chenery Corp., 318 U.S. 80, 95, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943) ("[A]n administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained.").
 
 
 80
 According to Judge Friendly, Chenery instructs that "[w]here the agency has rested decision on an unsustainable reason, the court should generally reverse and remand even though it discerns a possibility, even a strong one, that by another course of reasoning the agency might come to the same result." Henry J. Friendly, "Chenery Revisited: Reflections on Reversal and Remand of Administrative Orders," 1969 Duke L.J. 199, 222. According to the lead opinion, however, "the Supreme Court clearly limited Chenery to situations in which the agency failed to make a necessary determination of fact or of policy." At 1439. Chenery has traditionally been interpreted more broadly. Judge Friendly, for example, continues, "This is true whether the wrong reason is an erroneous view of the law, as in Chenery itself ... or simply a rationale ... that is logically untenable." Friendly, supra, at 222.
 
 
 81
 Having rejected the agency's proferred rationale, the lead opinion embarks upon an analysis of at best conflicting legislative history in hopes of "determin[ing] whether Congress has expressed a clear intent on the issue at hand." After stating that where "congressional intent is clearly discernable, the agency must act in accordance with that intent," the lead opinion apparently concludes the legislative history surrounding the adoption of section 315 meets this standard.[1] The contrary interpretation of the Supreme Court[2], other circuits[3], the dissenting members of this court, and over twenty years of FCC Commissions belies the supposed clarity of this history.
 
 
 82
 If the court accepted even the limited proposition that the legislative history, like the plain language of the statute, is ambiguous, it should remand to the Commission for further proceedings. The Commission argues for such a result. This would allow the Commission to consider its decision in light of our rejection of its TRAC-based analysis. Moreover, this case involves FCC regulations which impact broadcast media nationwide. It is undesirable for this circuit to announce a view of the statute when both parties ask that the FCC reconsider the statute, particularly given the distinct possibility that this court's decision will be the law in only seven states. It is far more prudent and practical to remand the case to allow the FCC to determine whether the 1959 amendment codified the fairness doctrine.
 
 
 83
 The Supreme Court has instructed appellate courts to give deference to agency interpretations of ambiguous statutes. Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-45, 104 S.Ct. 2778, 2781-83, 81 L.Ed.2d 694 (1984). Providing such deference presupposes giving the agency an opportunity to interpret the statute--an opportunity prevented by this court's decision not to remand. There is ample precedent for remand in situations similar to this case. See Cajun Elec. Power Coop. v. FERC, 924 F.2d 1132, 1136 (D.C.Cir.1991) ("[I]f an agency erroneously contends that Congress' intent has been clearly expressed and has rested on that ground, we remand to require the agency to consider the question afresh in light of the ambiguity we see."); Baltimore & Ohio R.R. v. ICC, 826 F.2d 1125, 1128-29 (D.C.Cir.1987).
 
 
 84
 The court today, in refusing to remand, defies the teachings of the Supreme Court.[4]
 
 
 
 [1]
 The National Association of Broadcasters, the Radio-Television News Directors Association, and CBS, Inc. join KARK-TV as intervenors in this action
 
 
 [2]
 47 U.S.C. Sec. 315(a) is known as the "equal time provision." This section requires that any licensed television or radio broadcast station which permits "a legally qualified candidate for any public office to use a broadcasting station, ... shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station."
 
 
 [3]
 We also note that if the Committee succeeds on the merits of its claim, it may be able to use the fairness doctrine violation to challenge KARK-TV's next application for license renewal. Therefore, a live dispute still exists between the parties
 
 
 [4]
 Amendment 2 proposed changes to the Arkansas usury laws which would have altered the interest rates for consumer loans. The Committee has indicated that the defeat of Amendment 2 in the 1990 election has not ended debate on this issue of public importance, and that the advocates of Amendment 2 continue to seek changes in Arkansas' usury laws. The Committee continues its opposition to any such changes of Arkansas law. Therefore, we must conclude that disputes over the public issues raised by Amendment 2 are likely to recur between the Committee and KARK
 
 
 [5]
 KARK suggests that the Committee could have intervened in prior proceedings before the FCC and therefore should not be permitted to bring the present action. Specifically, they contend that the Committee should have intervened in Syracuse Peace Council. This court is baffled by such reasoning. The controversy in Syracuse Peace Council arose in 1982, and was finally resolved in 1989, a full year before the ballot referendum at issue in this case. The Committee had no grounds to intervene in that prior proceeding. We remind KARK that agency adjudication should not be confused with notice and comment rulemaking. While it may be proper to bar those who failed to take advantage of an opportunity to challenge general rules during the process of notice and comment rulemaking from seeking judicial review, the same is not true of administrative adjudication. See Natural Resources Defense Council v. Nuclear Regulatory Comm'n, 666 F.2d 595, 602, n. 42 (D.C.Cir.1981) (to bar review because the petitioner was not a party to proceedings in which, by definition it could not join, would be to exalt literalism over common sense)
 
 
 [6]
 The D.C. Circuit found that the language used in the 1959 amendments made congressional intent unambiguous. TRAC v. F.C.C., 801 F.2d 501, rehearing en banc denied, 806 F.2d 1115 (D.C.Cir.1986), cert. denied, 482 U.S. 919, 107 S.Ct. 3196, 96 L.Ed.2d 684 (1987). Relying on the fact that Congress used the preposition "under" rather than the preposition "by" in the relevant section of the amendment, the TRAC court concluded that the 1959 amendment unambiguously did not codify the fairness doctrine. We do not think that this choice of words alone can determine the outcome of the statutory codification issue. The amendment refers to:
 the obligation imposed upon them under this chapter to operate in the public interest and to afford reasonable opportunity for the discussion of conflicting views on issues of public importance.
 47 U.S.C. Sec. 315(a) (emphasis added). There can be no doubt that "to operate in the public interest" is an obligation imposed "by " the act, as well as "under " the act. See 47 U.S.C. Secs. 303, 307, 309; National Broadcasting Co. v. United States, 319 U.S. 190, 218, 63 S.Ct. 997, 1010, 87 L.Ed. 1344 (1943); Red Lion, 395 U.S. at 380, 89 S.Ct. at 1801. Although the TRAC analysis is certainly tenable, we think the panel's analysis of the amendment in the context of its legislative history is the better approach. However, this difference in approach is not one of great weight. Regardless of whether we adopt the reasoning of TRAC or of the panel decision, the result will be the same; an unambiguous congressional intent not to codify the fairness doctrine.
 
 
 [7]
 The fairness doctrine has been significantly modified in the years subsequent to the 1959 amendment, and the Committee makes no claim that these modifications were impermissible. Therefore, the fairness doctrine, as it existed in 1959 must not have been codified by the amendment. We reject as overly speculative and vague the contention that Congress codified a general notion of fairness through the amendment
 
 
 [8]
 We note that prior to TRAC, the D.C. Circuit had stated on more than one occasion that the language in section 315(a) "codified the fairness doctrine as it was formulated by the FCC in its 1949 Report on Editorializing by Broadcast Licensees." See Kennedy for President Comm. v. FCC, 636 F.2d 432, 438 (D.C.Cir.1980). See also Straus Communications, Inc. v. FCC, 530 F.2d 1001, 1007 n. 11 (D.C.Cir.1976) (the doctrine which originally evolved under the authority of general provisions of the Act "has since received explicit statutory recognition in the 1959 amendment.")
 
 
 [9]
 The Committee seems to contend that this first step of a Chevron analysis involves exclusively an examination of the plain language of the statute. They object to this court's review and interpretation of the legislative history of the 1959 amendment. If that is indeed their position, the Committee has misunderstood Chevron. Under Chevron, a court must conduct an independent review of the statute and of its legislative history. Statutory interpretation is, after all, the expertise of the court. Deference to the agency is appropriate only when a court finds the statute to be ambiguous. See NLRB v. United Food & Commercial Workers Union, Local 23, 484 U.S. 112, 134, 108 S.Ct. 413, 416, 98 L.Ed.2d 429 (1987) (Scalia, J. concurring)
 
 
 [10]
 While we need not find the agency interpretation to be the best available interpretation of the statute, the agency interpretation cannot conflict with the language of the statute. See K Mart Corp., 486 U.S. at 294, 108 S.Ct. at 1819 (where no reasonable interpretation can support the agency's interpretation, deference is inappropriate)
 
 
 [11]
 We note that an agency interpretation of a statutory provision which conflicts with the agency's earlier interpretation is entitled to considerably less deference than a consistently held agency view. Watt v. Alaska, 451 U.S. 259, 273, 101 S.Ct. 1673, 1681, 68 L.Ed.2d 80 (1981). However, we keep in mind the caution that:
 [r]egulatory agencies do not establish rules of conduct to last forever; they are supposed, within the limits of the law and of fair and prudent administration, to adapt their rules and practices to the Nation's needs in a volatile, changing economy.
 American Trucking Ass'n, Inc. v. Atchison Topeka & Santa Fe Ry. Co., 387 U.S. 397, 416, 87 S.Ct. 1608, 1618, 18 L.Ed.2d 847 (1967)).
 
 
 [12]
 While nothing in our decision prevents the FCC from reinstating the fairness doctrine should the agency determine that "operate in the public interest" so requires, such a course of action would inevitably raise constitutional questions. However, those issues are not properly before us at this time, and we advance no opinion as to the continued constitutionality of the fairness doctrine. Were it proper to consider the issue, Judges Bowman, Beam and Loken agree with Chief Judge Arnold that the holding in Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969) may well be reconsidered by the Supreme Court now that broadcast frequencies and channels have become much more available
 
 
 [1]
 The lead opinion states that "[d]eference to the agency is appropriate only when a court finds the statute to be ambiguous." At 1440 n. 9. The lead opinion acknowledges that "the language of the 1959 amendment to section 315(a) is ambiguous." Id. at 1437. But, the lead opinion continues, "the legislative history makes it clear that the amendment does not codify the fairness doctrine." Id
 
 
 [2]
 See Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), discussed infra
 
 
 [3]
 See, e.g., Maier v. FCC, 735 F.2d 220, 225 n. 4-5 (7th Cir.1984); Larus & Brother Co. v. FCC, 447 F.2d 876, 882 (4th Cir.1971)
 
 
 [4]
 With the greatest respect for Chief Judge Arnold's views on the First Amendment as expressed in his opinion concurring in the judgment, I believe that the issue is not properly presented to us on the record now before us. Perhaps on remand a record could be made so that the issue could be properly considered